# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

FILED

OCT 2 2 2009

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

NETSCAPE COMMUNICATIONS CORP., )
    Plaintiff, )
              )
      v.             )      No. 1:09cv225
              )
VALUECLICK, INC., et al.,    )
    Defendants.      )

## MEMORANDUM OPINION

Although this patent infringement suit focuses on "cookies" of the Internet variety, not of the Toll House variety, there is nonetheless substantial dough involved here, as well. Specifically, plaintiff Netscape Communications Corp., the sole assignee of U.S. Patent No. 5,774,670 ("the '670 patent"), sues defendants—ValueClick, Inc., Mediaplex, Inc., FastClick, Inc., Commission Junction, Inc., MeziMedia, Inc., and Web Clients, L.L.C., (collectively "defendants")—for infringement and willful infringement of the '670 patent, which purports to cover the use of cookies in computer networks, including the Internet. As invariably occurs in patent infringement suits, the parties dispute the meaning of several material claim terms and phrases, thereby necessitating the *Markman*[1] claim construction determinations recorded here.

### I.

Central to construing a patent's claim terms is an understanding of the prior art, the prosecution history, and the claimed present invention.

---

[1] In its watershed decision in *Markman v. Westview Instruments*, the Supreme Court held the construction of patent claim terms to be "exclusively within the province of the court." 517 U.S. 370, 372 (1996).

*A. Prior Art*

At the time the '670 patent was submitted to the U.S. Patent and Trademark Office
("PTO") for approval in 1995, Internet users searched for, accessed, and retrieved
information—such as text, images, audio and video clips, and other media—most commonly
through an Internet network known as the World Wide Web ("the Web").[2] Generally, this
information was stored on a computer, called a "server," and was assigned a unique physical
"Web address" or "Uniform Resource Locator" ("URL"), much like a telephone number.
Electronic transfer of this information was facilitated by a set of Internet communications
protocols, known collectively as the Transmission Control Protocol/Internet Protocol ("TCP/IP").
One such protocol used in Internet communications on the Web is the HyperText Transfer
Protocol ("http").

Under the prior art, a client initiated the process of electronic transfer by placing a request
for a "file" with a server. On receipt of this request, the server transmitted the file to the client.
This client-server interaction was governed by one of the TCP/IPs. Where http was the operative
protocol, a Web user initiated a request by entering a URL associated with the desired
information into a Web browser program. This action then prompted the client computer to send
a request to the appropriate server. The server responded by sending the requested
"file"—typically in the form of an HyperText Markup Language document ("html
document")—over the Internet to the client. This html document commonly contained text,
embedded images, and/or other media. Significantly, the constituent parts comprising the html

---

[2] A detailed history of the Internet's development and description of its structure can be
found at *Reno v. ACLU*, 521 U.S. 844, 850-53 (1997) and *In re DoubleClick, Inc. Privacy Litig.*,
154 F. Supp. 2d 497, 500-02 (S.D.N.Y. 2001).

document could be housed on the same server associated with the URL, or alternatively, the html document could contain reference tags within its text directing a client's Web browser, upon receipt of the html document, to make additional requests to other servers at other URLs for constituent parts of the html document. The Web browser, having received the html document and other embedded media from one or multiple servers, then assembled the files into an integrated, viewable Web page. The client could then open, store, delete, or copy the file(s).

As the '670 patent teaches, in October 1995, a client's interaction with a server occurred in a "stateless" environment. This means that, over the course of a series of interactions, a server would have no recollection of responding to these prior requests. Accordingly, a server would essentially meet the client anew each time a client requested a file at a given URL, even if the URL was identical to the one previously entered by the user.

*B. Claimed Invention*

The invention claimed in the '670 patent is the creation of a "non-stateless" interaction within the http context.[3] In this environment, an http client using the invention operates with "memory" of the requests it has made to a specific server http and the responses it has received, and concomitantly, an http server operates with "memory" of the requests it has received and to which it has responded. Accordingly, an http client and an http server that have previously communicated recognize that prior interaction; they do not meet anew each time the http client makes a request.

Specifically, the present invention creates "memory" by claiming a method in which a

---

[3] In the non-Internet setting, such as in a Unix network system, existing technology in 1995 allowed computers to interact in a non-stateless manner.

server sends state information, commonly known as a "cookie," in the form of a "state object" to a client via http. Perhaps the most common examples of state information transmitted are client usernames, passwords, and preferences. The cookies are stored on the client system for a predetermined period of time. Notably, a client's or server's "memory" is coterminous with the existence of the cookie; that is, the cookie's expiration and deletion terminates the "memory." When the client requests information from or accesses a range of predefined URLs specified in the cookie, the state information is transmitted back to the server, allowing the server to recognize the client.

The presence of this "memory" facilitates a more complex interaction between clients and servers communicating via http. As the '670 patent teaches, the claimed invention has wide applicability and may be used in such applications as online shopping or online subscription services. Indeed, today the "cookies" technology is ubiquitous, and plays a large role in Internet users' Web browsing, as is evidenced by the proliferation of personalized Web portals such as MyYahoo! and iGoogle.

## C. Prosecution History

Lou Montulli, the inventor and '670 patent applicant, filed this patent with the PTO on October 6, 1995. On June 24, 1997, the patent examiner mailed a Notice of Election/Restriction to Montulli. Specifically, the notice required Montulli to elect for prosecution one of three sets of claims contained in the original patent. Montulli responded on July 23, 1997, electing to prosecute the invention that included claims 1-8, 12-17, and 27-30.[4] The patent examiner

---

[4] These claims were renumbered and correspond to the claims found in the issued '670 patent.

accepted this election and amendment in November 1997, noting that the allowance was granted because

> [t]he prior art of record does not teach or suggest transmitting a state object from a server to a client station wherein the state object comprises a "cookie" which functions within the HTTP browser environment in the manner disclosed and enabled in the specification at page 17, line 11 through page 18, line 22 and shown in Figures 4-5.

The '670 patent ultimately issued nearly one year later on June 30, 1998.

*D. Patent Claims and Disputed Claim Terms[5]*

The '670 patent consists of twenty-six claims, four independent claims (claims 1, 9, 10, and 14) and twenty-two dependent claims. Plaintiff alleges infringement of the four independent claims.

Claim 1, a method claim, describes the general process of sending state information in the form of state objects between clients and servers:

> 1. A method of transferring **state information** between an **http server** and an **http client,** said method comprising the steps of:
> requesting a **file** on **said http server** from said **http client;**
> transmitting said **file** from **said http server** to said **http client;**
> transmitting a **state object** from **said http server** to said **http client;** and
> storing said **state object** on said **http client.**

Dependent claims 2-8 more specifically define the parameters of the invention in two ways: first, the claims identify various possible attributes of the state object;[6] and second, the claims describe

---

[5] The disputed claim terms are set forth in boldface type in the quoted excerpts of the disputed claims.

[6] For example: "state object comprises a name attribute" (claim 2); "state object includes a domain attribute defining a domain" (claim 4); "state object further includes a path attribute defining a file system path" (claim 5); "state object includes an expiration attribute defining a valid life time of said state object" (claim 6); "state object includes an attribute requesting transmission using a secure channel" (claim 7); "state object is encoded within a header

particular sequences of, or prerequisites to, transmission.[7]

Claims 9, 10, and 14 provide additional details for the general process of state information transfer set forth in claim 1, although they are likewise independent claims. Claims 9 and 10, both product claims, further delineate the client and server roles in transferring, receiving, and retaining state information.

> 9. A **computer readable medium** on an **http client** containing **executable program instructions** for performing a method comprising:
> requesting a **file** on a [sic] **http server**;
> receiving said **file** from **said http server**;
> receiving a **state object** which specifies **state information** from **said http server**;
> storing said **state object** on said **http client**.
> 10. A **computer readable medium** on an **http server** containing **executable program instructions** for performing a method comprising:
> receiving a request for a **file** on **said http server** from an **http client**;
> transmitting said **file** from **said http server** to said **http client**;
> transmitting a **state object** which specifies **state information** from **said http server** to said **http client**.

Finally, claim 14, a system claim,[8] sets forth the requirements for a computer using the claimed technology. While claims 1-13 use http, claim 14 describes any computer system capable of requesting and storing state information in the manner specified, whether or not http governs the

---

associated with said file" (claim 8).

[7] For example: "transmitted . . . when said http client makes predefined http requests to said server and wherein said state object is transmitted along with said file" (claim 3); "state object is transmitted . . . only when said http client makes an http request to said server and said server is within said domain" (claim 4); "transmitted . . . only when said http client makes said http request for a document within said path at said server" (claim 5).

[8] Traditionally, patent claims are classified as "product" or "apparatus" claims or as "method" or "process" claims. Here, the parties refer to the '670's claim 14 as a "system" claim. It is generally understood that so-called "system" claims are synonymous with "product" or "apparatus" claims. *See DSW, Inc. v. Shoe Pavilion, Inc.*, 537 F.3d 1342, 1348 (Fed. Cir. 2008) (grouping apparatus and system claims together and distinguishing them from method claims).

transmissions.

> 14. A computer system, said computer system comprising:
> a processor;
> a memory coupled to said process;
> a **computer readable medium** coupled to said processor, said computer readable
>   medium containing **executable program instructions** for:
>   requesting a **file** on a server;
>   receiving said **file** from said **server**;
>   receiving a **state object** which specifies **state information** from said **server**;
>     and
>   storing said **state object** in one of the said memory and said **computer**
>     **readable medium**

The parties dispute the meaning of nine claim terms in the '670 patent as used in independent claims 1, 9, 10, and 14. These claim terms, set in boldfaced type above in the quoted claim excerpts, are:

(i) "**http**," as used in claims 1, 9, and 10;

(ii) "**server**," as used in claim 14.

(iii) "**http server**," as used in claims 1, 9, and 10;

(iv) "**http client**," as used in claims 1, 9, and 10;

(v) "**state object**," as used in claims 1, 9, 10, and 14;

(vi) "**state information**" as used in claims 1, 9, 10, and 14;

(vii) "**file**," as used in claims 1, 9, 10, and 14;

(viii) "**computer readable medium**," as used in claims 9, 10, and 14; and

(ix) "**executable program instructions**," as used in claims 9, 10, and 14.

Furthermore, defendants contend that an additional eight phrases or steps within a claim require construction. Specifically, they are:

(i) the specific steps comprising the method set forth in claim 1;

(ii) "requesting a file on said http server from said http client" or "requesting a file on a server" as used in claims 1, 9, and 14;

(iii) "transmitting said file from said http server to said http client" or "transmitting said file from said http server to said http client," as used in claims 1 and 10;

(iv) "transmitting a state object from said http server to said http client" or "transmitting a state object which specifies state information from said http server to said http client," as used in claims 1 and 10;

(v) "storing said state object on said http client" or "storing said state object in one of said memory and said computer readable medium," as used in claims 1, 9, and 14;

(vi) "receiving said file from said http server" or "receiving said file from said server," as used in claims 9 and 14;

(vii) "receiving a state object which specifies state information from said http server," as used in claims 9 and 14; and

(viii) "receiving a request for a file on said http server," as used in claim 10.

In practice, construction of these phrases overlaps significantly with construction of the claim terms enumerated above.[9] Accordingly, the only additional phrases requiring construction are those that concern the timing or order of steps in the invention. Specifically, they are: (i) "storing" as used in claims 1, 9, and 14; (ii) "said http server"; and (iii) the order of steps comprising the method set forth in claim 1.

## II.

Since the watershed ruling in *Markman*, much ink has been spilled over what principles

---

[9] For example, defendants request construction of "requesting a file on said http server from said http client." It is clear from defendants' proposed construction, however, that defendants essentially seek construction of the terms "file," "http server," and "http client." Because these claim terms will be construed individually, construction of the "requesting" step is unnecessary because the parties do not dispute the meaning of "request."

courts must use to construe disputed patent claim terms.[10] At this time, the following claim construction principles are now well-established and pertinent here:[11]

> (i) Patent terms are presumed to have their ordinary and customary meaning, which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc); *see also Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*, 381 F.3d. 1111, 1116 (Fed. Cir. 2004). Accordingly, "[s]uch a person is deemed to read the words used in the patent documents with an understanding of their meaning in the field, and to have knowledge of any special meaning and usage in the field." *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998).

> (ii) To determine the ordinary meaning of a claim term that is not immediately apparent, a court, in its effort to understand the disputed term from the perspective of a person skilled in the art, may look to "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Innova*, 381 F.3d at 1116.

> (iii) Generally, a court is instructed to consider the following hierarchy of

---

[10] Indeed, only three months after the Supreme Court's decision in *Markman*, the Federal Circuit began developing principles to guide patent claim construction. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996) (enumerating twenty cannons). While the decision to task courts with claim construction has unquestionably made the process more transparent, claim construction disputes have become increasingly intractable, particularly given that, as some scholars have argued, claim construction analysis has been complicated by the very principles that are meant to resolve interpretive disputes. *See* Dan L. Burk & Mark A. Lemley, *Fence Posts or Sign Posts? Rethinking Patent Claim Construction*, 157 U. Pa. L. Rev. 1743, 1751-57 (2009).

[11] The Federal Circuit's en banc decision in *Phillips v. AWH Corp.* thoroughly reviewed prior decisions elucidating the claim construction process and, importantly, clarified the role of extrinsic evidence. *See* 415 F.3d 1303, 1312-24 (Fed. Cir. 2005) (en banc). The principles set forth here are discussed at length in *Phillips*.

evidence: claim language, other intrinsic evidence,[12] and extrinsic evidence.[13] *See Advanced Cardiovascular Sys. v. Medtronic*, 265 F.3d 1294, 1304 (Fed. Cir. 2001) ("As always, we begin our construction with the words of the claim. After looking to the claim language we consider the rest of the intrinsic evidence, that is, the written description and the prosecution history if in evidence.").[14]

(iv) It is a "bedrock principle" of patent law that "the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Innova*, 381 F.3d at 1115. It follows from this principle that "[t]he written description part of the specification itself does not delimit the right to exclude. That is the function and purpose of claims." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370. Accordingly, a district court undertaking claim construction must "look to the words of the claims themselves . . . to define the scope of the patented invention." *Vitronics Corp. v. Conceptronic*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

(v) The inventor may act as his own lexicographer in coining or "reveal[ing] a special definition given to a claim term . . . that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316. A patentee's desire to redefine a claim term apart from its ordinary and customary meaning must be clearly indicated. *See Sinorgchem Co. v. ITC*, 511 F.3d 1132, 1136 (Fed. Cir. 2007); *Vitronics*, 90 F.3d at 1582 ("The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication.").

---

[12] Intrinsic evidence consists of the specification, the remainder of the patent document, and the patent prosecution history.

[13] Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 315 F.3d at 1317 (quoting *Markman*, 52 F.3d at 980).
Of course, courts may always consult and refer to extrinsic evidence as an aid to understanding the technology involved. *See supra* note 11; *see also Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.2d 1298, 1308-09 (Fed. Cir. 1999).

[14] The parties rely heavily—indeed, at times primarily, if not exclusively—on expert testimony to support their claim construction arguments. Yet, construction of the disputed claim terms in this case can be resolved solely on the intrinsic evidence. Importantly, this strong preference for considering intrinsic evidence as the primary authority for claim terms' meanings is consistent with the Federal Circuit's holding in *Phillips*, labeling extrinsic evidence as "less significant." 415 F.3d at 1317; *see also id.* at 1318 ("[C]onclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court.").

(vi) With regard to intrinsic evidence, the specification is the "single best guide to the meaning of a disputed term" and is usually "dispositive," because the court's claim construction determination should not be inconsistent with the clear language of a specification. *Phillips*, 415 F.3d at 1315. In addition, a court may further consider the patent's prosecution history—known also as the patent's "file wrapper"—for the purpose of determining whether to "exclude any interpretation that was disclaimed during prosecution." *Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005) (citation and quotation marks omitted).

(vii) It is a "cardinal sin" of patent law to "read[] a limitation from the written description into the claims." *SciMed Life Sys.*, 242 F.3d at 1340-41. Although there is "a fine line between reading a claim in light of the specification, and reading a limitation into the claim from the specification," it is well settled that a court may not "confin[e] the claims to those embodiments" found in the patent. *Phillips*, 415 F.3d at 1323. Indeed, the Federal Circuit has explicitly "rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment . . . because persons of ordinary skill in the art rarely would confine their definitions of terms to the exact representations depicted in the embodiments." *Id.* at 1323.

(viii) Comparison of disputed claim terms to other claims in the patent, both disputed and undisputed, is often illuminating because "a claim term should be construed consistently with its appearance in other places in the same claim or in other claims of the same patent." *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001). Concomitantly, differences among claims typically evidence the patentee's intent to distinguish claim terms, giving rise to the principle that "different claim terms are presumed to have different meanings." *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1382 (Fed. Cir. 2008).

(ix) While courts are not required to construe every disputed term—for the overarching goal of claim construction is to aid the jury's understanding of claim terms, not to be an "exercise in redundancy"—"when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute" and "the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it." *02 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360-63 (Fed. Cir. 2008).

It is through the lens of these guiding claim construction principles that the claim terms in the

'670 patent must be construed.

### III.

Although the principles of claim construction are well-established and cited by the parties, "the axioms themselves seldom provide an answer, but instead merely frame the question to be resolved." *Liebel-Flarshiem Co. v. Medrar, Inc.,* 358 F.3d 898, 904 (Fed. Cir. 2004). Accordingly, careful application of the principles previously enumerated is necessary to resolve the meaning of the disputed '670 patent claim terms.[15]

A. *"http," as used in claims 1, 9, and 10.*

The parties agree that "http" is "a stateless communications protocol," but disagree on whether the claim term refers specifically to the HyperText Transfer Protocol. Accordingly, plaintiff offers the construction, "HyperText Transfer Protocol, a stateless communications protocol," and defendants offer the construction, "a stateless protocol that allows web users/clients and websites/servers to communicate with each other." The claim interpretation principle that is dispositive here is the patentee's ability to act as his own lexicographer in explicitly defining claim terms. The application of this principle to the '670 patent clearly compels the conclusion that "http" means "HyperText Transfer Protocol, a stateless communications protocol, which allows Web clients and Web servers to communicate."

It is well settled that a patentee may act as lexicographer, provided that he express a clear

---

[15] As an initial matter, it is important to note that although the Federal Circuit previously has approved district courts' determinations that certain disputed claim terms did not require construction, the Federal Circuit recently clarified this point by noting that non-construction may contradict the duty imposed on courts by *Markman* if the scope of the claim term is fundamentally disputed. *See O2 Micro Int'l. Ltd.v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360-63 (Fed. Cir. 2008). In its initial *Markman* brief, plaintiff contended that the terms "file," "computer readable medium," and "executable program instructions" did not require construction. This contention fails here because parties' disputes over these claims terms are "fundamental," and "reliance on [the] term[s'] 'ordinary' meaning[s] does not resolve the parties' dispute." *Id.*

intent to define a claim term in the specification. *See Sinorgchem Co. v. ITC*, 511 F.3d 1132, 1136 (Fed. Cir. 2007). When such intent is manifest, the specification is essentially converted into a dictionary, written by the patentee, for the specific purpose of construing the disputed claim term. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). The definition supplied by the patentee is given deference by a court undertaking the task of construing claims, and ordinarily is dispositive of any claim construction dispute, absent justification to depart. *See ASM Am., Inc. v. Genus, Inc.*, 401 F.3d 1340, 1344 (Fed. Cir. 2005).

In the '670 patent, the patentee has provided the following clear definition of the claim term "http" in the specification: "Web clients and Web servers communicate using a protocol called 'HyperText Transfer Protocol' (HTTP)." '670 Patent Specification col. 1 ll. 53-55; *see also id.* col. 2 ll. 36-39 ("In an embodiment of the invention, the server uses a hypertext transfer protocol ('http') to communicate over the network with clients; such clients also communicate with the server using the hypertext transfer protocol."). Given that "http" is plainly an acronym for "HyperText Transfer Protocol," defendants' proposed construction—inclusive of any stateless Internet communication protocol—contravenes the patentee's express definition and accordingly finds no support in the intrinsic evidence.[16]

In addition, the patentee includes within his definition the fact that the protocol facilitates communication between Web clients and Web servers in either direction. Defining the claim term without these operative words would ignore an integral part of the definition as set forth in the specification. When the surrounding specification statements are considered, it becomes

---

[16] Tellingly, defendants explicitly recognize that "[t]he patentee provided an explicit definition of the term 'http'. See col. 1, lns., 53-55 ('Web clients and Web servers communicate using a protocol called "HyperText Transfer Protocol" (HTTP)')." Doc. 136 at 28 n.19.

clear that the purpose of defining "http" was not only to identify the particular protocol, but also to emphasize how the protocol would be used in the invention. *See Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1360 (Fed. Cir. 2004) ("In most cases, the best source for discerning the proper context of claim terms is the patent specification wherein the patent applicant describes the invention.").

In sum, where, as here, the patentee has explicitly defined a claim term in the specification, "the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316. Accordingly, "http" is construed to mean "HyperText Transfer Protocol, a stateless communications protocol, which allows Web clients and Web servers to communicate."

B. *"server," as used in claim 14.*

The term "server" appears only in claim 14,[17] a system claim. Plaintiff proposes the construction, "a provider of a data," while defendants propose the construction, "a computer that communicates, (i.e., provides documents) with a client over a network by using any communication protocol." Again, dispositive of this dispute is the claim construction principle recognizing the patentee's ability to act as his own lexicographer. When this principle is applied, it becomes clear that "server" means "a computer that provides data."

In the '670 patent, the patentee explicitly defines "server" as "refer[ring] to a computer's general role[] as a . . . provider of data (the server)." '670 Patent Specification col. 1 ll. 49-51; *see also id.* col. 4 ll. 28-30. Significantly, the patentee's intention to act as lexicographer is evidenced by two recognized indicators: (i) the use of quotation marks around the claim term and

---

[17] The word "server" also appears in conjunction with the word "http." Because the parties dispute that claim term separately, only "server" is considered here.

(ii) the patentee's use of the word "are." *See Sinorgchem Co.*, 511 F.3d at 1136 ("The term 'controlled amount' is set off by quotation marks—often a strong indication that what follows is a definition. . . . Moreover, the word 'is' . . . may signify that a patentee is serving as its own lexicographer."). Here, the patentee's intent to define the term "server" is manifest and accordingly controls.

By contrast, both parties' proposed constructions are inconsistent with the patentee's lexicography. Plaintiff's proposed construction—"a provider of data" is underinclusive because it omits the part of the definition referencing a computer. *See Sinorgchem Co.*, 511 F.3d at 1136-39 (holding that plaintiff's construction incorrectly encompassed only part of the definitional phrase following the word "is"). Here, the specification clearly indicates that the claim term "refer[s] to a *computer's* general role . . . as a provider of data." '670 Patent Specification col. 4 ll. 27-30 (emphasis added). Defendants' proposed construction, by contrast, is overinclusive because it makes reference to "any communication protocol" or "documents." Yet, these words do not appear in the patentee's definition, and defendants assert no justification for departing from the patentee's definition. *See ASM Am., Inc.*, 401 F.3d at 1344.

In sum, because the patentee "has elected to be a lexicographer by providing an explicit definition in the specification for a claim term . . . the definition selected by the patentee applicant controls." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1999). Accordingly, the claim term "server" is construed, pursuant to the patentee's instruction, to mean "a computer that provides data."

C. *"http server," as used in claims 1, 9, and 10.*

The parties' proposed constructions for "http server" closely track their respective

proposed constructions for "server," except here the definitions are tailored specifically to the http context. Plaintiff offers the construction "a provider of data that uses http," while defendants again offer a construction that makes reference to a computer, documents, and a communications protocol: "a computer that communicates (i.e., provides HTML documents that have been requested) with a client over a network by using the http protocol." Dispositive of the meaning of "http server" as used in the '670 patent is the claim construction principle that "a claim term should be construed consistently with its appearance in other places in the same claim or in other claims of the same patent." *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001). This principle, applied here, points persuasively to the conclusion that "http server" must be defined as "a computer that provides data using HyperText Transfer Protocol."

It is axiomatic that a district court undertaking claim construction must read claims and claim terms consistently throughout the document. *See Phillips*, 415 F.3d at 1314. More specifically, the Federal Circuit held in *Chamberlain Group, Inc. v. Lear Corp.* that, although a single word ("code") was used in conjunction with two different modifiers ("binary" and "trinary"), the word "presumptively should carry the same meaning throughout the patent." 516 F.3d 1331, 1337 (Fed. Cir. 2008). Accordingly, *Chamberlain Group, Inc.* stands for the proposition that a claim term ordinarily retains its singular meaning throughout the patent whether it is used alone or whether it is used in conjunction with a modifier.

This rule concerning modifiers can be squarely applied in construing "http server." Both the object and the modifier in this claim term—that is, "http" and "server"—have been previously construed, and should retain their respective constructions when used jointly. Thus, "http server" is construed to mean "a computer that provides data using HyperText Transfer

-16-

Protocol."

*D. "**http client**," as used in claims 1, 9, and 10.*

Closely related to "http server" is the disputed claim term "http client." The parties proposed constructions essentially match those offered for "http server," with the exception of substituting the word "requestor" for the word "provider." Accordingly, plaintiff proposes "a requestor of data using http" and defendants propose "a computer that communicates (i.e., requests HTML documents) with a server over a network by using the http protocol." As before, it is clear that the claim terms must be read consistently throughout the patent. Specifically, "http client" must be read in light of the previously determined construction of "http server," *see Chamberlain Group, Inc.*, 516 F.3d at 1337, particularly given the claim terms' close relationship in the '670 patent, *see, e.g.,* '670 Patent Specification col. 4 ll. 27-30 (defining "client" and "server" in relation to their complimentary roles). Given the foregoing discussion relating to the construction of "server" and "http server,"—and in light of the fact that "client" is specifically defined by the patentee as "refer[ring] to a computer's general role as a requestor of data (client)," *Id.* col. 4 ll. 27-30— the claim term "http client" must be defined as "a computer that requests data using HyperText Transfer Protocol."

*E. "**state object**" and "**state information**" as used in claims 1, 9, 10, and 14.*

The parties' dispute focuses on whether (i) "state object" and "state information" should have identical constructions, and (ii) if construed separately, what those constructions should be. Each question is discussed in turn.

*1. State Object and State Information Are Different Claim Terms*

Dispositive of this issue is the Federal Circuit's prohibition against stripping claim terms

-17-

of their meaning. *See, e.g., In re Gabapentin Patent Litig.* 503 F.3d 1254, 1263 (Fed. Cir. 2007) (accepting district court's construction because it "gives full meaning to every word of the entire claim term"); *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) (refusing construction that would leave a claim term with no meaning). Further, as a corollary rule, the Federal Circuit has sensibly held that "[i]n the absence of any evidence to the contrary, we must presume that the use of these different terms in the claims connote different meanings." *CAE Screen Plates v. Heinrich Fiedler GmbH & Co. KG*, 224 F.3d 1308, 1317 (Fed. Cir. 2000).

The application of these principles here points persuasively to the conclusion that the patentee ascribed different meanings to "state object" and "state information," and that defendants' attempt to give an identical construction is unavailing. For example, in claims 9 and 10, substitution of "state object" for "state information" yields: "receiving[/transmitting] a state object which specifies a state object." Likewise, reverse substitution leads to the equally awkward result of "receiving[/transmitting] state information which specifies state information." Clearly, then, the terms "state object" and "state information" cannot have identical meanings because, absent evidence to the contrary, it is presumed that the patentee did not intend such redundancy. *See Ortho-McNeil Pharms.,Inc. v. Myland Labs., Inc.*, 520 F.3d 1358, 1362-63 (Fed. Cir. 2008) (rejecting nonsensical result).

Defendants' arguments to the contrary are unpersuasive. Specifically, they point to a statement in the specification that allows the "term state object [to] also [be] used herein to refer to the state information." '670 Patent Specification col. 7 ll. 26-27. While defendants correctly observe that the two claim terms *can* be used interchangeably in some instances, the quoted statement does not *require* that the claim terms bear the same construction. Indeed, it is natural

-18-

to use the claim terms interchangeably in some circumstances, given their close relationship. For instance, it would be appropriate to make reference either (a) to a server's sending a state object containing state information, or (b) to a server's sending the state information itself.

In sum, because the use of different claim terms gives rise to the presumption that the claim terms should be construed separately, and because defendants present no persuasive evidence rebutting this presumption, "state object" and "state information" are given separate constructions here.

### 2. Construction of "State Object" and "State Information"

Plaintiff offers two separate constructions for these two claim terms. As to "state object," plaintiff proposes that the claim term be construed as "data having a predetermined structure that specifies state information." Relatedly, plaintiff proposes that "state information" be construed as "information, such as a cookie, that specifies an identity, a characteristic, or a condition of a client and/or a server." By contrast, because defendants believe the two claim terms are one and the same, they propose a single construction—"information concerning the web server's condition or transition as a result of the web user/client's request"—for both claim terms.

#### a. "*State Object*," as used in claims 1, 9, 10, and 14.

In this instance, it is appropriate to begin with the language of the claims. *See Advanced Cardiovascular Sys.*, 265 F.3d at 1304. Here, claims 9, 10, and 14 make clear that a "state object" is the form by which "state information" is transmitted. *See* '670 Patent Claims 9, 10, 14 (referring to "a state object which specifies state information"). This construction is confirmed by two embodiments found in the patent specification's summary of the invention. See '670 Patent Specification col. 2 ll. 32-33 ("[S]tate information . . . is typically in the form of a state

object.”); *id.* col. 2 ll. 52 (describing a “state object, which specifies the state information”). By contrast, defendants’ proposed definition—“information concerning the web server’s condition or transition as a result of the web user/client’s request”—is more appropriately considered with reference to the claim term “state information” because it relates to the type of data transmitted, rather than its form. Accordingly, because the claim language, confirmed by the specification, makes clear that a state object contains state information, the claim term “state object” is construed to mean “data having a predetermined structure that specifies state information.”

b. *“State Information,”* as used in claims 1, 9, 10, and 14.

The disagreement between the parties’ interpretations of “state information” focuses on whether state information includes client state information, server state information, or both. Plaintiff argues that “state information” encompasses both client and server information. Defendants agree that server state information is included, but argue that client state information was disclaimed in the course of patent prosecution. Dispositive here is the specification’s explicit reference to both client and server state information.

Where, as here, the ordinary meaning of the claim term is ambiguous, it is the specification that provides the “single best guide to the meaning of a disputed term.” *Vitronics*, 90 F.3d at 1582. The parties sensibly agree that the specification describes an online shopping embodiment establishes that “state information” may contain server state information, such as memory of the products presently held in an online shopping cart. *See, e.g.*, ’670 Patent Specification col. 2 ll. 60-62. In addition, the specification plainly indicates that

> the client system may access a Web server that is specified in the received cookies such that the client system transmits the cookies to the server, thus *providing state information about the client system to the server system.*

-20-

*Id.* col. 7 ll. 40-44 (emphasis added). Accordingly, the intrinsic evidence strongly supports a construction of "state information" that includes data pertaining to both a client or server.[18] "State information" is therefore construed to mean "information, such as a cookie, that specifies an identity, a characteristic, or a condition of a client and/or a server."

*F. "file," as used in claims 1, 9, 10, and 14.*

Plaintiff first asserts that no construction of "file" is necessary; alternatively, it proposes the construction, "information, such as data or a program, associated with an identifier or name."

_____

[18] Defendants contend that plaintiff may not rely on the online subscription service embodiment to support its argument that "state information" includes data relating to the client because the embodiment was disclaimed during the patent's prosecution in the PTO. Whether the patentee in fact disclaimed the online subscription service need not be reached, given that the specification clearly evidences the possibility that state information may contain data about the client. Nonetheless, out of an abundance of caution, and to define the scope of the disputed claim term more precisely, it is noted that the record evidence weighs against finding a prosecution disclaimer. Importantly, a district court undertaking claim construction may only recognize a clear and unambiguous disclaimer excepting a given construction from the scope of the patent. *See Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374-75 (Fed. Cir. 2008) (citation omitted). No such showing can be made here, as the prosecution history evidence points persuasively to the conclusion that the patent examiner included the online subscription service embodiment within the '670 patent's scope. Specifically, paragraph 1 of the Notice of Allowability, which states the patent examiner's reasons for allowing the patent prosecution to proceed, makes reference to the following passage, now found at column 7, lines 45-54 of the issued '670 patent:

> Examples of new applications [using this claimed extension of the http protocol] include on-line shopping that stores information about items currently selected by consumers, fee-for on-line services that can send back registration information and thus free users from retyping a user-id on next connection, and Web sites that can store per-user preferences on the client system and have the client supply those preferences every time the site is later accessed.

'670 Patent Specification col. 7 ll. 45-54. The patent examiner's reference to these "applications" of the claimed invention in its Notice of Allowability evidences an understanding that the online subscription service embodiment was included within the scope of the '670 patent. Accordingly, defendants fall short of establishing a clear and unambiguous disclaimer.

Defendants' proposed construction defines "file" as an "HTML document" in claims 1, 9, and 10, and simply a "document" in claim 14 because that claim does not refer specifically to the http context. Here, the dispositive claim construction principles are (i) the prohibition against using embodiments or limitations found in the specification to narrow the scope of the claim terms, and (ii) the rule of internal consistency. Application of these principles here compels the conclusion that "file" means "electronically stored or transmitted information or data" wherever that term appears in the '670 patent claims.

Both the plain language of the claims and the specification support this construction. In common computer parlance, "file" is widely understood to include electronically stored information or data in the form of text, images, documents, videos, other media, or even whole programs. As figure 2 indicates, a requested "file" under the '670 patent may be text or an image.

Defendants' proposed construction limits "file" to "html document," which defendants derive from references in the specification to an "HTML document." *See, e.g.,* '670 Patent Specification col. 12 ll. 14-17 ("The merchant Web server responds to the request with an HTML document . . . ."). Yet, defining "file" in this manner commits the "cardinal sin" of "reading a limitation from the written description into the claims." *SciMed Life Sys.*, 242 F.3d at 1340-41; *see also Phillips*, 415 F.3d at 1323 ("[W]e have repeatedly warned against confining the claims to . . . embodiments."). Thus, while some embodiments in the '670 patent do refer to an html document, the claims may nonetheless "embrac[e] different subject matter than is illustrated in the specific embodiments in the specification." *Nazomi Commc'ns, Inc. v. Arm Holdings, PLC,* 403 F.3d 1364, 1369-70 (Fed. Cir. 2005).

In addition, defendants attempt to bifurcate their construction of "file," giving the claim term one meaning in claim 14 and a separate meaning in the remaining disputed claims. Yet, this proposal contravenes the well settled claim construction principle requiring consistent interpretation of claim terms. *See Rexnord Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001); *Chamberlain Group, Inc.*, 516 F.3d at 1337; *PODS, Inc. v. Porta Stor, Inc.*, 484 F.3d 1359, 1366 (Fed. Cir. 2007); *Phillips*, 415 F.3d at 1314. Defendants present no intrinsic evidence, nor do they forecast any extrinsic evidence, justifying a departure from this rule of internal consistency and supporting a bifurcated approach to claim construction. Accordingly, the claim term "file" must have a singular meaning, applicable in all instances.

Finally, plaintiff's proposed construction, "data," is unpersuasive because it does not fulfil the mandate of the Supreme Court's *Markman* decision, which essentially tasks a court undertaking claim construction with "elaborating the normally terse claim language[] in order to understand and explain . . . the scope of the claims." *Embrex, Inc. v. Serv. Eng'g Corp.*, 216 F.3d 1343, 1347 (Fed. Cir. 2000) (first alteration in original) (quoting *Scripps Clinic v. Genentech, Inc.*, 927 F.2d 1565, 1580 (Fed. Cir. 1991)). It follows that claim construction must aid the jury in resolving the parties' dispute. In this case, substituting the single word "data" for the claim term "file" does not provide clarification, and would amount to little more than an "exercise in redundancy." *02 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360-63 (Fed. Cir. 2008).

In sum, the claim term "file" is not limited to an "html document" because such a narrow construction would impermissibly use an embodiment to limit the claim term's scope. Accordingly, the claim term "file" is construed to mean "electronically stored or transmitted

information or data."

G. *"computer readable medium,"* as used in claims 9, 10, and 14.

In the claimed invention, a "computer readable medium" is the device in which http clients and servers house executable program instructions and state information. In the course of the September 25, 2009 claim construction hearing, the parties sensibly agreed that "computer readable medium" means "storage device." Importantly, this construction is fully supported by the plain and ordinary meaning of the claim term, read in light in the specification. *See Phillips*, 415 F.3d at 1313. For example, claim 14 makes clear that storage is the key function of the computer readable memory; it houses both state information in the form of a state object and executable program instructions. *See also* '670 Patent Specification col. 5 ll. 5-10 (confirming storage function). Accordingly, "a storage device" is an appropriate claim construction for "computer readable medium."[19]

---

[19] It is worth noting that both parties' initial proposed constructions run afoul of settled claim construction principles. Specifically, defendants' proposed construction, "a magnetic or optical mass storage device," relies on a specification passage that teaches: "The server will typically include . . . a computer readable medium, *such as* a magnetic ("hard disk") or optical mass storage device." '670 Patent Specification col. 2 ll. 41-44 (emphasis added); *see also id.* col. 5 ll. 5-10. Significantly, the use of "such as" signals the use of an example; it does not indicate that the patentee is providing a definition. *See Catalina Mktg. Int'l v. Coolsavings.com, Inc.*, 289 F.3d 801, 811 (Fed. Cir. 2002) ("'[S]uch as' introduces an example of a broader genus rather than limiting the genus to the exemplary species."). This rule dovetails with the well-established principle that the specification cannot be used to limit patent claims. *See Nazomi*, 403 F.3d at 1369.

On the other hand, plaintiff's proposed construction, "memory," contravenes the presumption "that the use of . . . different terms in the claims connote different meanings." *CAE Screen Plates v. Heinrich Fiedler GmbH & Co. KG*, 224 F.3d 1308, 1317 (Fed. Cir. 2000). Here, claim 14 refers to both "a memory coupled to said processor" and "a computer readable medium coupled to said processor." '670 Patent Claim 14. The claim further directs that a state object be stored "in one of said memory and said computer readable medium." *Id.* Consequently, the claim term "computer readable medium" cannot mean "memory" because such a definition would render part of the claim language superfluous and redundant. *See In re*

*H. "executable program instructions," as used in claims 9, 10, and 14.*

Plaintiff asserts that no construction of "executable program instructions" is necessary and accordingly offers none. Defendants propose that "executable program instructions" must be construed as "object code (i.e., source code that has been compiled)." Here, application of the dispositive claim construction principle—that claim terms must presumptively be given their ordinary meaning as understood by a person of ordinary skill in the art, *see Phillips*, 415 F.3d at 1313—points persuasively to the construction, "a computer program that directs a client or server to perform certain operations."

In this case, both the claims (Nos. 9, 10, and 14) and the specification make clear that "executable program instructions" are located on both a client's and server's computer readable medium. These claims further teach that the role of the "executable program instructions" is to facilitate a client or server computer's transfer, receipt, or storage of state information or files. *See* '670 Patent Specification col. 2 ll. 41-53 ("[T]he computer readable medium of the server contains computer program instructions for transmitting the file from the server system to the client system and for transmitting the state object to the client system."). In addition, it is plain that "executable program instructions" can take various forms and contain various directives, structured in a certain sequence. For instance, the "executable program instructions" in claim 9 direct the computer to request, receive and store; the "executable program instructions" in claim 10 direct the computer to receive and then transmit.

Neither the claim language nor any other intrinsic evidence supports defendants'

---

*Gabapentin Patent Litig.* 503 F.3d 1254 (accepting district court's construction because it "gives full meaning to every word of the entire claim term"); *Bicon, Inc. v. Straumann Co.*, 441 F.3d at 950 (refusing construction that would leave a claim term with no meaning).

proposed construction, which uses the words "compiled" and "object code." These words are arguably technical in their own right and would require further construction. Thus, accepting defendants' construction would undermine the central purpose of claim construction, namely, "elaborating the normally terse claim language[] in order to understand and explain . . . the scope of the claims." *Embrex, Inc. v. Serv. Eng'g Corp.*, 216 F.3d 1343, 1347 (Fed. Cir. 2000) (first alteration in original) (quoting *Scripps Clinic v. Genentech, Inc.*, 927 F.2d 1565, 1580 (Fed. Cir. 1991)).

Accordingly, the most sensible reading of the claim term "executable program instruction" is "a computer program that directs a client or server to perform certain operations."

*I. "storing said state object on said http client" or "storing said state object in one of said memory and said computer readable medium."*

Defendants urge construction of the term "store" to mean "placing the state/object information in memory such that it can be sent back to the server from which the web user/client requested the HTML document." Plaintiff, meanwhile, asserts that no construction of the "storing" step is necessary. Here, the parties' disagreement, sharply focused, centers on whether the claim term "store" should reference the fact that a state object must be stored in a client system such that it may be sent back to a server. Dispositive of this interpretive dispute is the claim construction principle that "the words of the claims themselves . . . define the scope of the patented invention." *See Vitronics*, 90 F.3d at 1582 (citation omitted). When this principle is applied to the instant dispute, it becomes clear that "store" simply means "placing the state object in memory or a storage device."

The parties sensibly agree that the definition of "store" includes, at the least, "placing the

-26-

state object in memory," as such a construction is fully supported by the language of claims 1 and 14. In particular, claim 14 reads, as follows: "[S]toring said state object in one of said memory and said computer readable medium." *See* '670 Patent Claim 14. Yet, defendants seek to attach an additional attribute to the claim term "store," namely that a state object must be stored in a manner that allows for later retransmission. This argument, however, impermissibly relies on a description found in the specification, rather than the claim language itself, to define the claim term, thereby redefining the word "store" apart from its plain meaning and contravening a "bedrock principle" of patent law. *See Markman*, 52 F.3d at 930 ("The written description part of the specification itself does not delimit the right to exclude. That is the function and purpose of the claims."). Put simply, the plain meaning of "store" does not imply that storage must occur in a particular manner.

Accordingly, "store," as used in the '670 patent claims, means exactly what its plain meaning would suggest: "placing the state object in memory or a storage device."

*J.* **"said http server,"** *as used in claim 1.*

Claim 1's preamble states that the claimed invention involves a method of state information transfer "between *an* http server and *an* http client." '670 Patent Claim 1. Subsequent references to "an http server" in the patent claims use the words "said http server." Here, the parties dispute whether the use of "said http server" refers back to the same http server that receives a request from an http client. Specifically, plaintiff asserts that no claim construction is necessary, while defendants propose the claim construction, "the same server from which the user/client requested the HTML document." In this case, application of Federal Circuit decisions governing the import of "said" when used in claims leads to the conclusion that

"said http server" refers to "the same http server that received the request from the http client."

As explained in *Baldwin Graphics Systems, Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1343 (Fed. Cir. 2008), the use of the article "a" in a patent's claims carries the generic meaning of "one or more," as opposed to "the," which indicates a singular. Significantly, the use of "said" in subsequent references "does not change the general plural rule, but simply reinvokes that non-singular meaning." *Id.* Yet, an exception to this subsequent reference rule is made where "the language of the claims themselves, the specification, or the prosecution history necessitate departure." *Id.* (citations omitted).

While ordinarily "said http server" as used in the '670 patent refers back to multiple http servers because of the patentee's use of the article "an" in claim 1's preamble, the '670 patent specification provides strong justification to depart from this general rule. Specifically, the specification teaches that a server is a passive entity, which acts only when it receives a request from a client. *See, e.g.,* '670 Patent Specification col. 1 ll. 59-62 ("[T]he server serves a passive role, i.e., it accepts commands from the client and cannot request the client to perform any action."); *id.* col. 7 ll. 12-13 ("Using the teachings of the present invention, when a server *responds* to an http request . . . ."). It follows that in the context of claim 1, "said http server" will only transmit a file or state object when "said http client" places a request. Logically, then, the http server receiving the request must be the same http server that responds to the request.

The specification does not support the view that an http server receiving a request may essentially forward the request to another third-party server, which ultimately sends the desired information to the http client. Nor do the scenarios addressed in the course of the October 16, 2009 claim construction hearing suggest otherwise. Specifically, the parties discussed whether a

primary http server receiving a request for an html document might: (i) transmit html text, which contains embedded reference tags directing the http client's Web browser to make additional secondary requests for other files to third-party servers, as depicted in figures 2, 3A, and 3B; or (ii) gather other media, such as images, from other third-party servers, and ultimately transmit a complete, integrated html document to the http client. Importantly, in the first scenario, the http client makes an initial request to the primary http server by entering a URL, and, upon receipt of the unfinished html document, the Web browser automatically makes secondary requests to third-party http servers to complete the Web page, albeit absent any additional affirmative act by the user. Thus, both the primary and third-party http servers transmit files to the http clients only after receiving requests directly from the http client. Similarly, in the second scenario, third-party servers respond to requests made by the primary http server; they do not respond directly to the http client, nor are they necessarily aware of the http client's underlying request to the primary server because the http client has not established a connection with the third-party http server by making a request. Accordingly, only the primary server transmits a file directly to the http client because only the primary server has received a request directly from the http client.

In addition, it must be noted that the parties disagreed in the course of the October 16, 2009 hearing as to whether a third scenario is permitted under the http protocol, namely that an http client makes a request to a primary http server, which then directs a third-party http server to send a file directly to the http client. Such a scenario, however, must be rejected as implausible. The http protocol—upon which the claimed invention builds, but does not alter—does not allow an http server to initiate the establishment of a direct connection with an http client. Instead, only an http client may open a connection to an http server by sending a request. Thus, the parameters

-29-

of the http protocol exclude the possibility that "said http server," as used in claim 1, refers to an http server that does not receive a request from an http client.

In response, plaintiff argues that the specification includes references to multiple clients and multiple servers. Specifically, plaintiff cites the background of the invention section, *see id.* col. 1 ll. 48-55, and the description of client-server computing, which includes figure 1A, *see id.*, col. 4 ll. 17-27, which make reference to multiple "clients" and multiple "servers." These specification passages, however, at most establish the undisputed proposition that the Internet is a "network of networks," comprised of a veritable panoply of servers and indeed over a billion Internet users. This intrinsic evidence does not elucidate whether "said http server" as used in the '670 patent claims must be the same server that receives that request, and is not inconsistent with the fact that, as noted previously, a Web browser may make multiple requests to both primary and third-party servers in the course of assembling an integrated Web document.

In sum, the specification rebuts the presumption that the use of "an" is a generic use. By contrast, plaintiff's argument—which essentially requires an http server to transmit a state object or file even where it does not first receive an http client request—is inconsistent with the fact that http servers are passive entities. Accordingly, "said http server" is construed to mean "the same http server that received the request from the http client."

### K. *Order of Steps in Claim 1*

Defendants argue that the method described in claim 1 requires construction and propose that the claim's four steps occur in the following order: (1) request by the client for a file; (2)-(3) simultaneous transmission of the file and state object from the server; and (4) storage of the state object by the client. In response, plaintiff argues that the file and the state object need not be

transmitted simultaneously. Here, claim 1's steps do require construction because the description of the invention indicates that the steps must be performed in a certain order, although simultaneous transmission of the file and state object is not required under the principle that claim language may not be rendered superfluous by claim construction.

Ordinarily, "[u]nless the steps of a method actually recite an order, the steps are not ordinarily construed to require one." *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1342-43 (Fed. Cir. 2001) (citation omitted); *see also Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1370 (Fed. Cir. 2003). Yet, the intrinsic evidence may nonetheless implicitly require that the steps of a claimed method be executed in a certain order. *Id.*, 318 F.3d at 1370; *Interactive Gift Express*, 256 F.3d at 1343. In this case, the steps of this method, read in light of the patent specification, implicitly require that the method's steps be executed in a particular order. The reasoning for this determination is supported by two logical inferences about the claimed method: (i) according to the specification, the server, a passive entity, will not respond unless a request is made, *see* '670 Patent Specification col. 1 ll. 59-62, and thus the "requesting step" must be the initiating step; and (ii) an http client cannot store a state object until the http server sends the state object, and thus the "storing step" must be placed last in the sequence.

The parties' dispute focuses on the two middle steps of the claimed method—namely, whether the transmission of the file and state object from the http server to the http client occurs separately or simultaneously. Dispositive of this dispute is the language of claim 3, a dependent claim to claim 1, which refers specifically to a scenario where "said state object is transmitted *along with* said file." '670 Patent Claim 3 (emphasis added). Were simultaneous transmission required in claim 1, as defendants contend, the language in claim 3 specifying this particular

attribute would be redundant and superfluous. *See Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1382 (Fed. Cir. 2008) ("[D]ifferent claim terms are presumed to have different meanings.").

In response, defendants cite a passage in the specification that indicates, in discussing figure 4, that "the server returns an HTML document *together* with a header." *Id.* col. 7 ll. 31-35 (emphasis added). Yet, this description is but one embodiment of the claimed invention, and may not be used to limit the scope of the claims. *See Comark Commc'ns v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998).[20] Thus, at most, defendants demonstrate that steps (2) and (3) *may* occur simultaneously, although it is clear that the specification does not *require* simultaneity.

Accordingly, the four steps in the claim should be interpreted as being performed as four separate steps: (i) request for a file by the http client; (ii) transfer of the file from the http server to the http client; and (iii) transfer of the state object from the http server to the http client; and (iv) storage of the state object by the http client.

## IV.

Accordingly, for the reasons stated, the disputed claim terms are determined to have the following constructions:

- **"http,"** as used in claims 1, 9, and 10: "HyperText Transfer Protocol, a stateless communications protocol, which allows Web clients and Web servers to

---

[20] Nor can defendants persuasively counter that this quoted specification passage is a description of the "present invention," not an embodiment. In support of this position, defendants cite a description of figure 4—"FIG. 4 shows schematically the flow of information between a client and a server in accordance with the present invention," '670 Patent Specification col. 3 ll. 49-51—yet, the "in accordance with" phrasing merely reinforces the fact that figure 4 is but one embodiment of the claimed invention.

communicate."

- **"server,"** as used in claim 14: " computer that provides data."

- **"http server,"** as used in claims 1, 9, and 10: "a computer that provides data using HyperText Transfer Protocol."

- **"http client,"** as used in claims 1, 9, and 10: "a computer that requests data using HyperText Transfer Protocol."

- **"state object,"** as used in claims 1, 9, 10, and 14: "data having a predetermined structure that specifies state information."

- **"state information"** as used in claims 1, 9, 10, and 14: "information, such as a cookie, that specifies an identity, a characteristic, or a condition of a client and/or a server."

- **"file,"** as used in claims 1, 9, 10, and 14: "electronically stored or transmitted information or data."

- **"computer readable medium,"** as used in claims 9, 10, and 14: "a storage device."

- **"executable program instructions,"** as used in claims 9, 10, and 14: "a computer program directing a client or server to perform certain operations."

- **"storing,"** as used in claims 1, 9, and 14: "placing the state object in memory or a storage device."

- **"said http server,"** as used in claims 1, 9, 10, and 14: "the same http server that received the request from the http client."

- The steps of claim 1 should be construed, as follows: (i) request for a file by the http client; (ii) transfer of the file from the http server to the http client; and (iii) transfer of the state object from the http server to the http client; and (iv) storage of the state object by the http client.

Alexandria, VA
October 22, 2009

T. S. Ellis, III
United States District Judge