

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

NETSCAPE COMMUNICATIONS CORP., )
    **Plaintiff,** )
     )
    v. )        **No. 1:09cv225**
     )
VALUECLICK, INC., et al., )
    **Defendants.** )

## MEMORANDUM OPINION

In this patent infringement suit, plaintiff claims that defendants[1] wilfully infringed, and continue to infringe, U.S. Patent No. 5,774,670 ("the '670 patent"), colloquially known as the "Internet cookies patent." At issue are the parties' various motions for summary judgment. More precisely, the parties filed cross-motions as to the following issues:

> (i) that the '670 patent is invalid pursuant to 35 U.S.C. § 102(b), commonly referred to as the "on-sale bar," which prohibits a patent applicant from obtaining a patent where the claimed invention was on sale more than one year prior to application; and

> (ii) that plaintiff has waived its right to enforce the '670 patent.

In addition, plaintiff moves for partial summary judgment as to the following defenses:

> (i) the invalidity defense of public use pursuant to 35 U.S.C. § 102(b), which prohibits a patent applicant from obtaining a patent where the claimed invention was in public use more than one year prior to application;

> (ii) the invalidity defense that the patented invention was anticipated by prior art publications and patent applications pursuant to various provisions of 35 U.S.C. § 102;

---

[1] The six named defendants are ValueClick, Inc., Mediaplex, Inc., FastClick, Inc., Commission Junction, Inc., MeziMedia, Inc., and Web Clients, L.L.C., (collectively "defendants").

-1-

(iii) the invalidity defense of nonjoinder or misjoinder of named inventors pursuant to 35 U.S.C. § 102(f);

(iv) the equitable defense of equitable estoppel; and

(v) the defense of federal preemption of defendants' state law counterclaims of intentional misrepresentation or fraud, negligent misrepresentation or constructive fraud, and unfair competition.

Finally, defendants move for summary judgment as to the following issues:

(i) the invalidity defense that '670 patent claims 9, 10, and 14 are fatally indefinite under 35 U.S.C. § 112, which requires claims to state particularly and distinctly the subject matter claimed as the invention;

(ii) the equitable defense of laches;

(iii) non-infringement of '670 patent claims 1-8 under any claim construction;

(iv) non-infringement of all '670 patent claims under defendants' proposed *Markman* claim constructions; and

(v) willful infringement.

The parties' various motions have been fully briefed and argued, and are now ripe for resolution.

## I.

The '670 patent claims "a method and apparatus for transferring state information between a server computer system and a client computer system." '670 Patent Abstract. Prior to this invention, http clients and http servers interacted in a "stateless environment," which prevented an http server from recognizing that it had responded to prior requests made by an http client. Thus, in essence, a server would essentially meet the client anew each time a client requested a file from the server. The subject of the '670 patent—commonly known as Internet "cookies technology"—claims a method of transferring and storing state information on an http client such that an http client would have "memory" of its requests to a specific http server, and

concomitantly, an http server would have "memory" of the requests it had received and to which it had responded.

The '670 patent contains twenty-six claims. Claim 1, upon which claims 2-8 depend, describes the general method of transferring and storing state information in four distinct steps:

> A method of transferring state information between an http server and an http client, said method comprising the steps of:
>> requesting a file on said http server from said http client;
>> transmitting said file from said http server to said http client;
>> transmitting a state object from said http server to said http client; and
>> storing said state object on said http client.

Importantly, steps 1 and 2 are indisputably part of the prior art and are neither innovative nor unobvious; steps 3 and 4—that is, the transfer and storage of a cookie—comprise the claimed invention that purports to address the http protocol's heretofore statelessness.[2] Building on this general four-step process, claims 2-8 further define the method of transferring state information by (i) identifying additional attributes of the state object, and (ii) specifying particular sequences of, or prerequisites to, transmission and retransmission of state information.

While claims 1-8 describe the *method* of transferring state information, claims 9-10 and 14-26 describe the various computer *systems* capable of executing the claimed method.[3] Specifically, claim 9 describes a computer readable medium on an http *client* that contains executable program instructions that perform the claimed method. Similarly, claim 10 provides

---

[2] For a brief description of the prior art and claimed invention, *see Netscape Commc'ns Corp. v. ValueClick, Inc. (Netscape I)*, --- F. Supp. 2d ----, 1:09cv225, at 2-4 (E.D. Va. Oct. 22, 2009) (Mem. Op.).

[3] *See Netscape I*, --- F. Supp. 2d ----, 1:09cv225, at 6 n.8 (citing *DSW, Inc. v. Shoe Pavilion, Inc.*, 537 F.3d 1342, 1348 (Fed. Cir. 2008)) (distinguishing method/process claims with product/system/apparatus claims). *See generally* 1-1 Chisum on Patents §§ 1.02-1.03 (2009).

the counterpart to claim 9 in describing a computer readable medium on an http *server* that is capable of performing the claimed method. Claim 14, then, lists the requirements of an http client computer system—namely, a processor, memory coupled to the processor, and a computer readable medium containing executable program instructions—capable of performing the claimed method. Finally, claims 15-26 apply the attributes and special conditions found in claims 2-8 to the computer systems described in claims 9, 10, and 14.

As often occurs in patent infringement suits, the parties disputed the meaning of a number of patent claim terms. Accordingly, following full briefing and oral argument, the disputed terms were construed in accordance with *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996). *See Netscape I*, --- F. Supp. 2d ----, 1:09cv225. Relevant to the disposition of the various motions at bar are the following claim term constructions:

- "**file,**" as used in claims 1, 9, 10, and 14: "electronically stored or transmitted information or data."

- "**state object,**" as used in claims 1, 9, 10, and 14: "data having a predetermined structure that specifies state information."

- "**state information**" as used in claims 1, 9, 10, and 14: "information, such as a cookie, that specifies an identity, a characteristic, or a condition of a client and/or a server."

- The steps of claim 1 should be construed, as follows: (i) request for a file by the http client; (ii) transfer of the file from the http server to the http client; (iii) transfer of the state object from the http server to the http client; and (iv) storage of the state object by the http client.

*Id.* at 33.

## II.[4]

---

[4] The material and undisputed facts set forth herein are derived from the parties' pleadings, memoranda and exhibits submitted in support of their various motions for summary

The following undisputed material facts are pertinent to the various motions at bar:

1. Plaintiff, the assignee and sole owner of the '670 patent, is a Delaware corporation with its principal place of business in Virginia. Plaintiff is a wholly-owned subsidiary of AOL, L.L.C ("AOL"). *See* Am. Answer ¶ 1.

2. Defendants ValueClick, Inc., Mediaplex, Inc., FastClick, Inc., Commission Junction, Inc., and MeziMedia are Delaware or California corporations with their principal places of business in California. Defendant Web Clients, L.L.C. is a Delaware limited liability company with its principal place of business in Pennsylvania. Defendants are related business entities; ValueClick, Inc. wholly-owns the other defendants, which operate as ValueClick's subsidiaries. They provide online marketing services, including advertising campaigns, to business segments in the United States. *See* Am. Answer ¶¶ 2-8, 13.

3. In 1994, MCI Communications Corp. ("MCI") began developing an online shopping mall known as "marketplaceMCI," which was to consist of four components: (i) an MCI-branded Web browser; (ii) a Web server designed to integrate the other components; (iii) a "Merchant server," used by various sellers to "receive and fill orders and, depending on merchant circumstances, to aid in the billing and charging process"; and (iv) various back-end systems allowing MCI to provide technical support and maintain merchant accounts. *See* Defs.' Attach. 2 ¶ 6.[5] MCI developed some of the marketplaceMCI software in-house and contracted with other vendors, such as Netscape, to develop and program other aspects of marketplaceMCI. *See id.*

4. On August 10, 1994, plaintiff's representatives met with MCI personnel to consider whether Netscape could provide MCI with software for marketplaceMCI. *See id.*; Defs.' Ex. 8, at 63. Specifically, MCI sought technology that would allow the transfer and processing of online customer order, billing, and shipping information. This required that servers interact with client computers in a non-stateless environment. Defs.' Attach. 2 ¶ 8; Defs.' Ex. 9, at 111. During the meeting, plaintiff initially proposed software technology that involved storing state information on a server; MCI rejected

---

judgment, and the representations made by counsel in the course of the September 25, 2009 and December 18, 2009 hearings. *See Rothe Dev. Corp. v. U.S. Dep't of Defense*, 262 F.3d 1306, 1316 (Fed. Cir. 2001) (citing Rule 56(c), Fed. R. Civ. P.).

[5] Defendants' expert opines that the "On-line Shopping System Application" embodiment described in the '670 patent specification is a "fairly explicit marketplaceMCI example." Defs.' Attach. 2 ¶ 19.

this proposal and instead specified that state information was to be stored on client computers. Although the parties dispute whether certain technological requirements were discussed,[6] the parties agree that, at a minimum, there was a general understanding by the end of the August 10, 1994 meeting that any product sold to MCI required client storage of state information. *See, e.g.,* Defs.' Ex. 4, at 96-99; Defs.' Ex. 5, at 61-62; Defs.' Ex. 19, at 101; Pl.'s Statement of Disputed Facts ¶¶ 3-6 ("Netscape agrees only . . . that Netscape would design and develop a web browser product and a server software product that would store state information on the client side as opposed to the server side."). This MCI requirement—that is, the storage of state information on a client computer following transmission of a file and state information—is indistinguishable from claim 1's four-step method.

5. Netscape and MCI representatives continued to negotiate following the August 10, 1994 meeting. *See* Defs.' Ex. 5, at 81-82 (Cerf's deposition testimony that Klensin "very likely" met with Netscape employees for follow-up meetings); Defs.' Ex. 8, at 64 (Sha's deposition testimony that "[he] had many subsequent meeting [sic]"). As Netscape co-founder and vice president Marc Andreessen stated in an internal email dated August 28, 1994, "someone's gonna ask again me [sic] how much money MCI has given us—answer is I don't know yet; deal is still being struck. . . . We are 100% MCI's selected software partner." Defs.' Ex. 15.

6. On September 8, 1994, MCI and Netscape representatives met again in Sunnyvale, California, where they agreed to a licensing agreement in principle. More specifically, plaintiff initially offered MCI a certain number of licenses for a commercial version of its Web browser, at the time called Mosaic, for $3.6 million. MCI ultimately agreed to pay $7.2 million for a greater number of licenses. *See* Defs.' Ex. 8, at 66-68; Defs.' Ex. 9, at 111-12. That same day—September 8, 1994—Netscape co-founder Jim Clark sent an email to Netscape executive Bill White stating, "[o]ur deal with MCI is great." *Id.* at 114.[7] In an email dated September 25, 1994, Andreessen notes that MCI

---

[6] Specifically, defendants claim that Netscape and MCI representatives engaged in an all-day design session in which name-value pairs and secure encryption were discussed. *See, e.g.,* Defs.' Ex. 5, at 98. By contrast, plaintiff contends that the meeting involved only "high-level" discussions that did not progress beyond MCI's general requirement that state information be stored on the client. *See, e.g.,* Defs.' Ex. 19, at 113.

[7] This email is fully reproduced in a book co-authored by Clark, entitled *Netscape Time: The Making of the Billion-Dollar Startup that Took on Microsoft.* Defs.' Ex. 9. Plaintiff attempts to dispute this fact by "agree[ing] only that the book . . . refers to an email that was purportedly sent by Jim Clark." Pl.'s Statement of Disputed Facts ¶ 8. Yet, Clark testified in his

is "writing such large checks to us these days." Defs.' Ex. 12.[8]

7. Following the August 10, 1994 meeting, Andreessen tasked Lou Montulli, a Netscape programmer and the named '670 patent inventor, with satisfying MCI's requirements. This task entailed writing source code directing a client computer to receive and store state information sent from a server. Although MCI employees Vincent Cerf and John Klensin did not specify how Netscape was to accomplish MCI's requirements, see Defs.' Ex. 5, at 78, it is undisputed, as Andreessen testified, that this MCI project "eventually led to the creation of cookies," thereby providing an explicit evidentiary link between the product sold to MCI and the patented technology. Pl.'s Ex. 45, at 102; see also Defs.' Opp'n Ex. 15, at 140. Montulli testified that while he was not specifically aware that MCI was a Netscape customer, he was asked in the summer of 1994—according to his best recollection, in July or August 1994[9]—to develop a "shopping cart methodology" that would specifically

deposition that he was "confident that this e-mail was from [him]," and that he was not going to dispute that it was created by him on or around September 8, 1994. Defs.' Ex. 10, at 79-80. Thus, plaintiff fails to create an actual dispute of fact here.

[8] Although there appears to be a dispute concerning the precise timing and amounts of payments, those disputes are immaterial as the current record clearly and convincingly reflects that MCI made substantial payments to Netscape in September 1995. Article 6(b)(i) of the February 1995 Netscape-MCI licensing agreement states that $500,000 was paid on September 23, 1994, "receipt of which is hereby acknowledged by Netscape." Defs.' Ex. 13, at 9. Although plaintiff in its brief denies receiving this payment, plaintiff's cited evidence in support of this denial—namely deposition testimony of Netscape and MCI executives—fails to raise a genuine issue of material fact. At most, this testimony demonstrates only that the deponent (i) lacked direct knowledge of the financial arrangements between the companies, see Defs.' Ex. 4, at 184-85, or (ii) had no specific recollection of whether payment was made, see Defs.' Ex. 10, at 89-90. In the course of the September 25, 2009 hearing, plaintiff, by counsel, conceded that the $500,000 was "probably paid," but suggested that the payment could have been for consulting services, not software. See Transcript at 82 (Sept. 25, 2009). The record evidence does not support this contention. The licensing agreement specifically states that a $500,000 pre-payment was made for "Netscape Software," not consulting services, see Defs.' Ex. 13, at 9, and indeed, the agreement also reflects a separate $100,000 retainer payment for consulting services, see id. at 14-15. It is worth noting, however, that even if no payment was received, the on-sale bar would still apply because a mere commercial offer is sufficient to invoke § 102(b). See Weatherchem Corp. v. J.L. Clark, Inc., 163 F.3d 1326, 1333 (Fed. Cir. 1998) (holding immaterial the fact that no money exchanged hands until after the critical date).

[9] In a response to defendants' interrogatories, plaintiff confirms that "[t]he dates of conception of the inventions covered, disclosed, or claimed in the '670 patent are as early as

address the "sessionless[, *i.e.*, stateless] nature of HTTP." Defs.' Opp'n Ex. 16, at 114-19. Thus, the undisputed record evidence supports a finding that the software produced for MCI by Montulli in the summer of 1994 contained cookies functionality that addressed the http protocol's statelessness by instructing a client computer to store state information sent from a server.

8. Prior to writing the cookies source code, Montulli engaged in design review sessions with senior Netscape programmer John Giannandrea. *See* Defs.' Ex. 21, at 58-63. According to Giannandrea's declaration submitted to the U.S. Patent and Trademark Office ("U.S. PTO"), these meetings occurred in July and August 1994. During these meetings, Montulli (i) verbally disclosed the invention of "an HTTP state object, commonly known as a cookie," which was later claimed in the '670 patent, and (ii) diagrammed the invention with Giannandrea on a whiteboard. Defs.' Ex. 23 ¶¶ 2-3. Accordingly, these meetings clearly evidence Montulli's disclosure of a fully-conceived cookies invention by August 1994. In addition, important to the issue of inventorship is that Giannandrea's role in these meetings was limited to validating the design and making general suggestions; he did not participate in the invention's implementation. *See* Defs.' Ex. 21, at 58-66.

9. In September 1994, plaintiff sent MCI and Silicon Graphics, International—both Netscape clients—a test version of the Mosaic Web browser. *See* Defs.' Exs. 12, 15, 16. Plaintiff does not dispute that it sent an early version of its Web browser to MCI and Silicon Graphics, International; rather Netscape argues that these early releases could not have contained cookies technology. No record evidence establishes whether these test versions were cookies-functional. In addition, defendants assert that test versions were sent to the San Jose Mercury News and Digital Equipment Corporation, and that a nascent version of the Web browser was publicly demonstrated at the Interop trade show. As discussed *infra*, these factual assertions are unsupported by defendants' cited evidence.

10. The Netscape source code repository first records a draft computer source code containing cookies functionality on October 3 or 4, 1994. Additional cookies source code was entered into the repository on October 6 and October 13, 1994.[10] *See* Pl.'s Ex. 42 ¶¶ 22-23; Pl.'s Ex. 43 ¶ 40.

---

July-August 1994." Pl.'s Ex. 1, at 26.

[10] The parties dispute the date on which the cookies invention was reduced to practice. Specifically, plaintiff submits that the invention was reduced to practice no earlier than October 13, 1994, while defendants submit that the invention was reduced to practice prior to October 6, 1994. Plaintiff, by counsel in the course of the September 25, 2009 hearing, argued that the issue

11. Montulli, the named inventor, filed the '670 patent application with the U.S. PTO on October 6, 1995. The '670 patent issued on June 30, 1998.

12. Between 2001 and 2005, defendants ValueClick, Mediaplex, and Commission Junction entered into marketing and advertising agreements with plaintiff's parent company, AOL. *See* Defs.' Ex. 35. Moreover, in 2004 defendant Commission Junction "announced the launch of an online affiliate marketing program . . . to promote the new Netscape Internet Service." Defs.' Exs. 39, 40. It is undisputed that neither Netscape nor AOL disclosed the existence of the '670 patent to ValueClick, Mediaplex, or Commission Junction in negotiating and entering into these agreements.

13. The parties dispute whether Montulli or other Netscape employees participated in the Internet Engineering Task Force, a standards-setting organization, in an individual capacity or on behalf of plaintiff in 1997 and 1998. *See, e.g.,* Pl.'s Ex. 13; Defs.' Ex. 58, at 13-22. In addition, assuming that Montulli or other Netscape employees were members of this organization—and that plaintiff, through its employees, was also a member—the parties dispute material facts relating to the existence, nature, and implementation of any organization disclosure obligation and the extent of members' compliance with such disclosure obligations. *See, e.g.,* Pl.'s Exs. 22-26; Defs.' Exs. 59, 60, 76, 78. Notwithstanding these factual disputes, the parties agree that plaintiff did not disclose the '670 patent to the Internet Engineering Task Force, although, according to plaintiff, the organization was aware of the patent following its issuance in 1998. *See, e.g.,* Pl.'s Exs. 25, 26.

14. Plaintiff filed the instant suit on February 27, 2009, alleging willful infringement and continued infringement of the '670 patent. Defendants had no knowledge of the '670 patent prior to the filing of this suit. *See* Pl.'s Statement of Facts ¶ 8.

### III.

---

was "a question of fact for the jury to decide" based on competing expert testimony. *See* Transcript at 87-88 (Sept. 25, 2009). Yet, the date on which an invention is reduced to practice is a legal determination based on underlying facts. *See Taskett v. Dentlinger,* 344 F.3d 1337, 1339 (Fed. Cir. 2003). Thus, the parties may not argue, as a *factual* matter, that there is a genuine dispute regarding when the invention was reduced to practice simply because their respective experts conclude that the invention was reduced to practice by different dates, *compare* Pl.'s Ex. 38 ¶¶ 14-15, *with* Pl.'s Ex. 42 ¶¶ 22-23 *and* Pl.'s Ex. 43 ¶ 40; the parties may, however, dispute facts underlying this legal determination, although in this case the parties agree that draft cookies source code existed as of October 3 or 4, 1994.

Plaintiff and defendants move for summary judgment on defendants' § 102 and § 112 invalidity defenses. Specifically, the parties filed cross-motions for summary judgment on the issue of the § 102(b) statutory on-sale bar. In addition, plaintiff argues that it is entitled to summary judgment on the following invalidity defenses: (i) public use under § 102(b), and (ii) inventorship under § 102(f).[11] Finally, defendants contend that they are entitled to summary judgment on their defense that claims 9, 10, and 14 are fatally indefinite pursuant to § 112. With respect to these invalidity defenses, it is important to note that "[a] patent is presumed to be valid, so a party alleging invalidity further faces an evidentiary burden of *clear and convincing evidence* to show facts supporting a conclusion of invalidity." *Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1351 (Fed. Cir. 2009) (emphasis added). As the Federal Circuit has explained, "[t]he 'clear and convincing' evidence standard is an intermediate standard which lies somewhere in between the 'beyond a reasonable doubt' and the 'preponderance of the evidence' standards of proof," and in practice requires that "the ultimate factfinder [have] an abiding conviction that the truth of [the claimants'] factual contentions are highly probable." *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1360 n.5 (Fed. Cir. 2007) (citations and quotation marks omitted).

*A. On-Sale Bar*

Section 102(b) states that a person is prohibited from applying for a patent if "the invention was . . . on sale in this country, more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b). Defendants contend that the '670 patent is

---

[11] Plaintiff also moves for summary judgment with respect to defendants' § 102 prior art invalidity defense. Resolution of this issue is deferred pending further briefing.

invalid under § 102(b) because the invention claimed in the patent was offered for sale, and indeed sold, to MCI in August and September 1994, more than one year prior to the filing of the '670 patent application on October 6, 1995.

The § 102(b) bar, colloquially known as the "on-sale bar," was well elucidated in *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55 (1998). There, the Supreme Court identified two conditions for the application of the on-sale bar: (i) a commercial offer of an invention that is (ii) ready for patenting prior to the statutory one-year period, *i.e.*, the "critical date." Importantly, the party claiming invalidity must establish both prongs of the *Pfaff* test by clear and convincing evidence. *Clock Spring, L.P. v. Wrapmaster, Inc.*, 560 F.3d 1317, 1325 (Fed. Cir. 2009).

The *Pfaff* decision first requires that the product "be the subject of a commercial offer for sale." *Pfaff*, 525 U.S. at 67. This requirement is further separated into two distinct, constituent elements: (i) a commercial offer for sale, and (ii) a sufficient degree of identity between the product offered for sale and the patented invention. *See Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1353 (Fed. Cir. 2002). The Federal Circuit has defined a "commercial offer" to mean "one which the other party could make into a binding contract by simple acceptance." *Group One, Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1048 (Fed. Cir. 2001). As to identity between the offered product and the patented invention, the Federal Circuit has also held that a party invoking the § 102(b) on-sale bar must prove that "the device sold 'fully anticipated the claimed invention or would have rendered the claimed invention obvious by its addition to the prior art.'" *Allen Eng'g Corp.*, 299 F.3d at 1352 (quoting *Tec Air, Inc. v. Denso Mfg. Mich. Inc.*, 192 F.3d 1353, 1358 (Fed. Cir. 1999)). Notably, "[s]ection 102(b) does not require a strict identity between the claimed invention and the device involved in the public use or on sale

-11-

activities." *In re Smith*, 714 F.2d 1127, 1137 n.13 (Fed. Cir. 1983). *See generally* 2-6 Chisum on Patents § 6.02[3][c] (2009) (discussing identity).

The second *Pfaff* prong requires that the invention "be ready for patenting," demonstrated either by (i) "proof of reduction to practice before the critical date," or (ii) "proof that prior to the critical date the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention." *Pfaff*, 525 U.S. at 67-68. Where, as here, the invention involves software or computer programming, this second *Pfaff* requirement may be satisfied even though there is no "actual completion of such software . . . , provided that there is a disclosure that is sufficiently specific to enable a person skilled in the art to write the necessary source code to implement the claimed method." *Robotic Vision Sys. v. View Eng'g*, 249 F.3d 1307, 1312 n.2 (Fed. Cir. 2001), *cited with approval in Auction Mgmt. Solutions, Inc. v. Manheim Auctions, Inc.*, 2009 WL 801800 (N.D. Ga. Mar. 24, 2009). Moreover, the Federal Circuit has also held that ordinarily "creation of the specific source code is within the skill of the art." *Robotic Vision Sys. v. View Eng'g*, 112 F.3d 1163, 1166 (Fed. Cir. 1997). It remains to apply these principles to the record facts in this case.

### 1. Commercial Offer

The first *Pfaff* prong requires a commercial offer for sale. In this case, undisputed record evidence clearly and convincingly establishes that Netscape made a commercial offer to MCI prior to October 6, 1994, the critical date. According to an email by Andreessen, negotiations between MCI and Netscape were ongoing by at least August 28, 1994: "[S]omeone's gonna ask again me [sic] how much money MCI has given us—answer is I don't know yet; deal is still being struck. . . . We are 100% MCI's selected software partner." Defs.' Ex. 15. These

-12-

negotiations culminated at a September 8, 1994 dinner meeting between Netscape and MCI executives, who outlined a licensing agreement for a "commercial version of Mosaic," a cookies-functional Web browser. As Netscape co-founder Clark recounts in his book, *Netscape Time*, MCI agreed to Netscape's offer to license the Mosaic Web browser for $7.2 million. *See* Defs.' Ex. 9, at 111-12; *see also* Defs.' Ex. 8, at 66-68. This agreement is confirmed in a September 8, 1994 email from Clark, in which he states that "[o]ur deal with MCI is great." Defs.' Ex. 9, at 114 (reproducing email). Additionally, a February 1995 MCI-Netscape licensing agreement reflects that Netscape received a $500,000 pre-payment for "Netscape Software" on September 23, 1994. *See* Defs.' Ex. 13, at 9; *supra* note 8.

In response to these facts, plaintiff contends that MCI could not have received any cookies-functional software products prior to the October 13, 1994 public release of the Mosaic Web browser. This argument, however, misunderstands the first *Pfaff* prong, which makes immaterial the date of delivery and focuses instead on the offer for sale. *See Weatherchem Corp. v. J.L. Clark, Inc.*, 163 F.3d 1326, 1333 (Fed. Cir. 1998) ("It is immaterial that the record shows no delivery . . . until after the critical date."). Put another way, this prong of the *Pfaff* test requires only that the patented technology be *offered* for sale; the test requires neither that the sale actually be consummated, nor that the product ultimately be delivered.

Thus, ample record evidence recounts ongoing negotiations between Netscape and MCI in August and September 1994 culminating in a September 8, 1994 meeting, at which MCI accepted in principle Netscape's offer to license a cookies-functional Web browser for approximately $7 million. This clear and convincing evidence establishes that a commercial offer was made prior to October 6, 1994, the critical date. Whether there is sufficient identity

between the technology Netscape offered for sale and the contested '670 patent claims is addressed next.

### 2. Identity

In addition to proving a commercial offer for sale, the undisputed record evidence clearly and convincingly establishes sufficient identity between the product offered for sale to MCI in August and September 1994 and claim 1 of the '670 patent. Yet, by the same token, the current record evidence does not support a finding on summary judgment that claims 2-10 and 14-26 were offered for sale prior to the critical date.

It is well-settled that there are two methods of proving identity under the *Pfaff* test, namely the anticipation test and the obviousness test. As the Federal Circuit has stated, a party claiming invalidity under the on-sale bar must prove that "the device sold 'fully anticipated the claimed invention or would have rendered the claimed invention obvious by its addition to the prior art.'" *Allen Eng'g Corp.*, 299 F.3d at 1352 (quoting *Tec Air, Inc. v. Denso Mfg. Mich. Inc.*, 192 F.3d 1353, 1358 (Fed. Cir. 1999)).[12]

With respect to the anticipation test, it is important to emphasize that a district court applying the on-sale bar to a patent claim must record "specific findings linking elements of the [offered product] to claim limitations of the [instant] patent." *Id.* at 1355. Further, a district court must also make specific findings as to each contested patent claim because the on-sale bar may invalidate patent claims containing certain claim limitations, but not patent claims

---

[12] *See also Scaltech Inc. v. Retec/Tetra, L.L.C.*, 178 F.3d 1378, 1383 (Fed. Cir. 1999) (anticipation); *TorPharm Inc. v. Ranbaxy Pharms., Inc.*, 336 F.3d 1322, 1327 (Fed. Cir. 2003) (citation omitted) (obviousness). *See generally* 2-6 Chisum on Patents § 6.02[3][c] (discussing identity requirement).

containing different claim limitations. *See id.* at 1353. This result is sensible because each claim, whether independent or dependent, is presumed valid in its own right, and "dependent claims necessarily add limitations to the claims from which they depend and therefore may not be subject to the same asserted grounds of invalidity." *Dana Corp. v. Am. Axle & Mfg.*, 279 F.2d 1372, 1376 (Fed. Cir. 2002). Moreover, in *Scaltech* the Federal Circuit clarified that the anticipation test does not require that "the offer specifically identify these limitations" provided that "the process that was offered for sale inherently possessed each of the claim limitations." *Scaltech Inc. v. Retec/Tetra, L.L.C.*, 178 F.3d 1378, 1383-84 (Fed. Cir. 1999). Put simply, the on-sale bar applies even if the offer does not reference each of the patent claim limitations; it is sufficient if the product or method offered for sale inherently possessed each of the claim limitations.

With respect to the obviousness test, which adopts and applies the analysis performed when a party claims invalidity under § 103,[13] the Supreme Court has made clear that "obviousness is a question of law based on underlying findings of facts," namely: (i) the scope and content of the prior art, (ii) the characteristics and understanding of an individual of ordinary skill in the art at the time of invention, (iii) the differences between the claimed invention and the prior art, and (iv) the evidence of secondary factors of non-obviousness. *See Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966). Where the parties dispute these predicate facts, no legal finding of obviousness can be made on summary judgment. *See Source Search Techns., LLC v.*

---

[13] *See* 35 U.S.C. § 103(a) (invalidating a patent where "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains").

*LendingTree, LLC*, 588 F.3d 1063, 1071-73 (Fed. Cir. 2009).

These principles, applied here, compel the conclusion that prior to October 6, 1994, Netscape offered for sale to MCI the method described in claim 1 of the '670 patent. That method contains the following steps, each of which must be linked to elements of the product offered for sale: (i) an http client's requesting a file from an http server; (ii) an http server's sending the requested file; (iii) an http server's sending a "state object" containing state information, commonly referred to as a "cookie"; and (iv) the storage of this state object on the http client.[14] There can be no serious dispute that the first two elements of claim 1 were part of the offer of sale prior to the critical date. The third and fourth elements require further discussion.

During the August 10, 1994 meeting, it is undisputed that MCI rejected Netscape's initial proposal to store state information on a server, and that both companies understood by the end of the meeting that MCI required client storage of state information. Indeed, both Netscape and MCI meeting attendees confirm that these "MCI requirements" were discussed and agreed to on August 10, 1994:

- Dr. Cerf of MCI testified that during the August 10, 1994 meeting, "we needed the Netscape browser, the client side, to perform some functions that it did not in its initial implementation, and specifically I insisted that there be a capability to store the state of the user of the—of the marketplaceMCI system on the client side. . . . [W]e were outlining specific requirements, including the need to store information on the client side, and that was probably the most significant addition that we required before we felt we could use their product in this martketplaceMCI system. . . . We stated what the requirements were as clearly as we could, and subsequently, Netscape responded with a design." Defs.' Ex. 5, at 61-62.

_____

[14] *See Netscape I*, --- F. Supp. 2d ----, 1:09cv225, at 19-21, 33.

- Dr. Klensin of MCI testified that during the August 10, 1994 meeting, "[w]e came out with a clear understanding that this information had to be stored client side" and that "by the time the session ended, there was a general understanding between the MIT [sic] people and the Netscape people what needed to be done. It needed to be done on the client side, that the state information where the user was last in the marketplace needed to be *transmitted from the server to the client* in some way. *The client needed to keep it*. There would be minimum information kept on—minimal or zero information kept on the server, and that's what I'm referring to as general design parameters." Defs.' Ex. 4, at 19, 96-99, 101 (emphasis added).

- Andreessen of Netscape testified that during the August 10, 1994 meeting, "Vint [Cerf] and I sat down as part of the discussions of MCI's requirements for their marketplaceMCI, and we presented our architecture and our thoughts and ideas. And at a certain point, they said, oh, you mean that a user has to log back in every time they show up on the Web site? And we said, yes, because that's how it worked at the time. And they said, that won't work. We need to have the ability for the server, or in their case, the shopping mall to recognize that the user has been there already, and to have the user's information essentially already available so that after the first visit, the users don't have to log in again." Defs.' Ex. 19, at 101-02.

And as plaintiff's own opposition summary judgment brief states, "Netscape agrees . . . that Netscape would design and develop a web browser product and a server software product that would store state information on the client side as opposed to the server side." Pl.'s Statement of Disputed Facts ¶ 5.

This evidence clearly and convincingly establishes that the four steps of claim 1 were discussed at the August 10, 1994 meeting. Steps 1 and 2 of the method—the http client's request for a file and the http server's transmitting the requested file—are found in (i) Andreessen's statement that the user, *i.e.*, the http client, "show up on the Web site," and (ii) Dr. Cerf's testimony that MCI was buying a Netscape Web browser. The use of a Web browser by an http client to navigate the Internet necessarily and inherently requires an http client to send a request to an http server for a file, and for the http server to respond by transmitting a file which is then

assembled and displayed on the http client computer.[15] Thus, the claim limitations described in steps 1 and 2 were inherently part of the product offered for sale, and hence the offered product anticipates those limitations. *See Scaltech*, 178 F.3d at 1384. Steps 3 and 4 of claim 1—the http server's transmitting a state object and the storage of that state object—were likewise discussed on August 10, 1994, as evidenced by Dr. Klensin's and Andreessen's explicit testimony. Most telling is Dr. Klensin's undisputed statement that the meeting participants understood that state information "needed to be transmitted from the server to the client in some way" and that "the client needed to keep it." Defs.' Ex. 4, at 98-99. This testimony tracks precisely steps 3 and 4 of claim 1 of the '670 patent, and hence the offered product also anticipates these claim limitations. Thus, according to meeting participants with firsthand knowledge of the discussions, the four steps of claim 1 were indisputably discussed on August 10, 1994, and thereafter sold by September 8, 1994.

In response, plaintiff argues that identity is not established with respect to claim 1 because Netscape did not know on August 10, 1994, that it would use the cookies invention to satisfy MCI's technological requirements of state information storage on a client computer, and hence the on-sale bar cannot be applied. Although Netscape and MCI did not discuss the specific source code to be used in accomplishing state information storage on a client computer on that

---

[15] *See* Defs.' Opp'n Ex. 24 ¶ 28; Defs.' Attach. 5 ¶ 25; *see also* '670 patent specification col. 1 ll. 39-62 ("The Mosiac [sic] browser allows a user to retrieve documents from the World-Wide-Web . . . . Under the Web environment, Web browsers reside in clients and Web documents reside in servers. . . . A browser opens a connection to a server and initiates a request for a document. The server delivers the requested document . . . .").

date,[16] plaintiff's argument in this respect nonetheless fails because claim 1 neither requires nor specifies that a particular source code must be used. Instead, claim 1 contains only the limitation that state information be sent in the form of a "state object," which, as construed in *Netscape I*, is "data having *a* predetermined structure that specifies state information." *Netscape I*, --- F. Supp. 2d ----, 1:09cv225, at 19-20, 33 (emphasis added). A "cookie," with its particular programming syntax, is but one possible embodiment of the invention that addresses statelessness, and claim 1 is not limited to this specific statelessness solution. Indeed, claim 1 requires only that state information be conveyed in a structured manner. In this case, the storage of state information on a client necessarily and inherently requires that this data be conveyed in a structured manner, and therefore the Netscape and MCI August 10, 1994 discussion of state information storage on a client computer fully satisfies and anticipates claim 1's limitations. *See Scaltech*, 178 F.3d 1383-84 (rejecting requirement "that the offer specifically identify these limitations" so long as "the process that was offered for sale inherently possessed each of the claim limitations"). Put simply, although the cookies invention was not referenced as such, the limitations set forth in claim 1 clearly were discussed and agreed upon.

Furthermore, plaintiff's argument also fails because the undisputed record evidence clearly and convincingly establishes (i) that the cookies invention was part of the product offered and sold to MCI in satisfaction of MCI's technological requirements of state information storage

---

[16] As Dr. Cerf recounts, "we basically said we need it to perform this way. I didn't care how [Netscape] did it. I only cared that it meet the requirements. So we stated what the requirements were as clearly as we could, and subsequently, Netscape responded with a proposed design." Defs.' Ex. 5, at 62. Moreover, Dr. Cerf states, "I also reiterate that what MCI and what John [Klensin] and I were asking for is a solution to a particular requirement. We made, as I recall, no specific demands on its implementation. We only outlined what it is that we needed, what outcome we needed." Pl.'s Ex. 41.

on a client computer, and (ii) that Netscape's decision to use the cookies invention to satisfy

MCI's requirements occurred before the critical date. To begin with, the record evidence shows

that Netscape developed the Internet cookie to address the issue of statelessness between

marketplaceMCI shoppers and marketplaceMCI merchants. Indeed, Andreessen stated this fact

directly in testifying that Netscape's developing software for marketplaceMCI "eventually led to

the creation of cookies." Pl.'s Ex. 45, at 102. Additionally, Andreessen recounts:

- "[W]e gave [Montulli] the project of satisfying MCI requirements. We broadened it out to say, make it a general mechanism, because we don't want to build a feature just for one customer." Defs.' Ex. 19, at 137.

- A: We were building a general product for general consumption, general distribution, general sale. We built the cookie functionality into the browser in part to satisfy MCI's requirements, but as I said, we had broadened that requirement to be a general function for everybody to be able to use.
  Q: So you expected that *the cookie functionality would be included in browsers sold not just to MCI,* but to other customers as well?
  A: *Yes, that it correct.*
  Q: And MCI was okay with that?
  A: Yes. In fact, it would have been a requirement. It never even came up as an issue because they would have wanted everybody to be able to visit MCI marketplace.
  Defs.' Opp'n Ex. 15, at 140 (emphasis added).

It is equally clear from this record that Netscape made the decision to use the Internet

cookie to satisfy MCI's technological requirements prior to the critical date. Specifically,

Montulli recounts that while he did not know of a specific customer's request for the cookies

technology, he does recall that, in July or August 1994, he began working on "something that's

become known as the Web cookie." According to Montulli, he was tasked in summer 1994 with

developing technology for a "shopping cart methodology" that would specifically address the

"sessionless nature of HTTP" and that would ultimately be implemented in an "e-commerce

server." Defs.' Opp'n Ex. 16, at 114-19. Montulli further characterized the goal of the Internet cookie, as follows:

> when a user connects to a Web site and retrieves a document, in a shopping cart situation, you're trying to get them to say, I want to choose a product, or a service. And when you make that action, they may get a Web page that says you chose this product, but when you reconnect to the server again, the server doesn't know that you were the guy who selected the product, and so it forgets that you selected the product.

*Id.* at 118-19. This testimony is consistent with Dr. Klensin's description of marketplaceMCI as including a "merchant server" or "commerce server" that would "receive and fill orders and, depending on merchant circumstances, . . . aid in the billing and charging process," and further corroborates Andreessen's recollection that the cookies invention was Netscape's solution to MCI's statelessness issue. Defs.' Attach. 2 ¶ 6. In sum, the record evidence, taken as a whole, clearly and convincingly shows that Netscape offered for sale, prior to the critical date in August and September 1994, the method described in claim 1, and hence the anticipation test as set forth in *Allen Eng'g Corp.* and *Scaltech* is met.[17]

Although the undisputed record evidence clearly and convincingly establishes that each of the elements of the method set forth in claim 1 was offered for sale prior to the critical date, the § 102(b) on-sale bar must be applied on a claim-by-claim basis. *See Allen Eng'g Corp.,* 299 F.3d at 1353. Thus, the conclusion that independent claim 1 is invalid under § 102(b) does not automatically invalidate claims 2-8, even though claims 2-8 are dependent on claim 1.

Here, claims 2-8 specify particular attributes relating to the general method set forth in claim 1, such as whether the cookie expires or whether the transfer of state information must

---

[17] Given this, it is not necessary to reach or decide whether identity is shown by clear and convincing evidence under the obviousness test.

occur over a secure connection. Claims 9, 10, and 14-26 specify the hardware and software requirements of computer systems—*i.e.*, http clients and http servers—capable of performing the general four-step method set forth in claim 1 under the particular conditions described in claims 2-8. In this case, the current record does not warrant a finding on summary judgment that there is sufficient identity between claims 2-10 and 14-26, and the product discussed at the August 10, 1994 meeting or sold to MCI thereafter under either the anticipation test or obviousness tests.

With respect to the anticipation test, the record does not contain a sufficiently detailed description of marketplaceMCI to allow a claim-by-claim and limitation-by-limitation comparison of marketplaceMCI to the contested claims. *See Scaltech Inc.*, 178 F.3d at 1383 (holding that the "subject of the barring activity [must] [have] met each of the limitations of the claim"). At best, Dr. Klensin states that "the relationship between marketplaceMCI design work and Netscape's evolving product design and implementation plans is evidenced in the '670 patent itself by the use of a fairly explicit marketplaceMCI example in the section of the '670 Patent . . . entitled 'An On-line Shopping System Application.'" Defs.' Attach. 2 ¶ 19. Yet, even assuming this description is sufficiently detailed, summary judgment in favor of defendants would not be warranted under the anticipation test because the parties dispute whether the attributes enumerated in claims 2-8 were discussed at the August 10, 1994 meeting, and no record evidence establishes that Netscape and MCI discussed the computer hardware and software systems described in claims 9-10 and 14-26. *Compare, e.g.,* Defs.' Ex. 5, at 98 (Cerf testimony of "name-value pairs" discussion at meeting), *with* Defs.' Ex. 19, at 113 (Andreessen testifying that "I don't think it got to the level of granularity of something like name-value pairs."). Accordingly, for purposes of the on-sale bar, the summary judgment record does not

-22-

permit a finding that what was offered for sale in August and September 1994 anticipated claims 2-10 and 14-26 of the '670 patent.

Nor can defendants establish by clear and convincing evidence identity of claims 2-10 and 14-26 under the obviousness test on the summary judgment record because the predicate facts underlying an obviousness analysis are plainly contested.[18] Specifically, the parties dispute the characteristics and understanding of an individual of ordinary skill in the art in 1994. *Compare* Pl.'s Ex. 4 ¶ 35 (requiring a bachelors degree in computer science or computer engineering and approximately two years of experience), *with* Defs.' Supp. Br. Attach. C ¶ 54 (requiring masters degree in computer science or electrical engineering and 1-3 years experience). Additionally, even assuming the parties agreed on the characteristics of one of ordinary skill in the art, summary judgment would still be inappropriate here. Although the parties submit competing expert opinions as to whether certain prior art references render the claimed invention obvious,[19] the parties do not offer any testimony as to whether the August 10, 1994 Netscape-MCI discussions would have made the patented technology obvious to one of ordinary skill in the art. Only expert testimony regarding the August 10, 1994 discussions is relevant to the on-sale bar analysis because the § 102(b)/§ 103 hybrid analysis considers the subject of the offer for sale to be a prior art reference and poses the obviousness question in

---

[18] As noted *supra*, the obviousness analysis relies on four factual findings: (i) the scope and content of the prior art, (ii) the characteristics and understanding of an individual of ordinary skill in the art at the time of invention, (iii) the differences between the claimed invention and the prior art, and (iv) the evidence of secondary factors of non-obviousness. *Source Search Techns., LLC v. LendingTree, LLC*, 588 F.3d 1063, 1071-73 (Fed. Cir. 2009).

[19] *See, e.g.*, Pl.'s Ex. ¶¶ 46-240 (providing claim-by-claim rebuttal testimony to defendants' expert regarding obviousness and anticipation based on prior art).

relation to that reference. *See TorPharm Inc. v. Ranbaxy Pharms., Inc.*, 336 F.3d 1322, 1327 (Fed. Cir. 2003) (citation omitted).[20] Furthermore, it is clear that a material factual dispute exists as to the prior art's content, namely whether the storage and transfer of state information in both http and non-http contexts was within the prior art before August 10, 1994.[21] Accordingly, where, as here, the parties dispute facts underlying the obviousness determination, summary judgment is inappropriate. *See Source Search Techns.*, 588 F.3d at 1071.

In sum, the *Pfaff* test requires that the claimed invention be the subject of the commercial offer for sale. This requirement does not mandate strict identity and is satisfied by either (i) showing that the product fully anticipated each of the claimed invention's limitations, or (ii) showing that the product sold rendered the contested claims obvious. In this case, identity is proven by clear and convincing evidence as to claim 1 because a product designed to execute the four-step method described in claim 1—namely, a cookies-functional Web browser—was sold to MCI in August and September 1994 for incorporation into the marketplaceMCI product. By contrast, material record facts are disputed as to (i) whether claims 2-10 and 14-26 were fully anticipated by the marketplaceMCI product, and (ii) whether the discussions on August 10, 1994

---

[20] It is worth noting that Dr. Klensin states his personal belief that "the technology covered by those claims 1, 9, 10, 14, is an obvious consequence of MCI requirements as specified to Netscape by MCI during the August 10, 1994 meeting," but Dr. Klensin nowhere defines a person of ordinary skill in the art, nor does he conduct the obviousness analysis from this person's perspective. Defs.' Attach. 2 ¶ 21.

[21] *Compare* Defs.' Opp'n Ex. 16 (Montulli testifying that "there were other ways of dealing with [the statelessness problem in the context of MCI's requirements]"), *with* Defs.' Attach. 2 ¶ 21 ("The general technology for sharing state between two computers generally . . . was very well understood in the industry . . . prior to the August 10, 1994 meeting. . . . [T]he technology described in very broad terms in claim 1 is the only plausible realization of that shared state model.").

would have made claims 2-10 and 14-26 obvious to one skilled in the art.

### 3. Ready for Patenting

Finally, the undisputed record satisfies by clear and convincing evidence the *Pfaff* test's requirement that the claimed invention be "ready for patenting" prior to the critical date. This conclusion is reached under two theories: (i) "by proof that the invention was reduced to practice prior to the critical date"; and (ii) "by proof that prior to the critical date the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention." *Pfaff*, 525 U.S. at 67-68.

Pertinent to the "ready for patenting" theory is the record fact that Montulli logged a draft of the http cookies source code into the Netscape source code repository prior to October 6, 1994, the critical date. As plaintiff's experts concluded:

> Based on my review of the [Netscape Concurrent Version System repository], log entries . . . on October 4, 1994 show that Lou Montulli checked in new versions of the mkhttp.c and mkaccess.c files with the comment: 'changes to implement Set-Cookie: and Cookie:' . . . . In version 1.14 of mkaccess.c, dated 5:12am UTC on October 4, 1994, and version 1.141 of mkhttp.c, dated 5:12am UTC on October 4, 1994, Mr. Montulli added code pertaining to HTTP cookies.

Pl.'s Ex. 42 ¶¶ 22-23; *see also* Pl.'s Ex. 43 ¶ 40 (opining that browser-side-cookies code was entered into source code repository on October 3, 1994).[22] Additionally, plaintiff, by counsel in the course of the September 25, 2009 hearing, stated that "[p]art of the method was done *by* October 6th. An early part of it went in on October 3rd." Transcript at 85-86 (emphasis added). In response, Netscape asserts that "no 'deal' or software product could have included the claimed

---

[22] Additional undisputed record evidence, namely Giannandrea's deposition testimony, establishes that "Mosaic"—the commercial name of Netscape's web browser using cookies technology—was "being built" in September 1994. Defs.' Ex. 21, at 81.

'cookie' technology prior to October 13, 1994" because the public Web browser was not released until that date, and hence the invention could not have been reduced to practice prior to the critical date. Yet, this statement misunderstands the law governing the "ready for patenting" *Pfaff* prong because it assumes that an invention is only reduced to practice, and thus the on-sale bar can only be applied, after the source code has been perfected.[23] To the contrary, it is well-settled that the *Pfaff* test may be satisfied despite the patentee's continued refinement of the invention.[24] Accordingly, where, as here, the undisputed record evidence shows that draft cookies source code existed as of October 3 or 4, 1994, the second *Pfaff* prong is satisfied.

Moreover, with respect to inventions involving computer code, *Pfaff* simply requires complete *conception* of the invention, not the source code's actual completion, provided that there is an enabling disclosure that would allow one skilled in the art to complete the invention. *See Robotic Vision Sys.*, 249 F.3d at 1311-13. The facts of *Robotic* provide an instructive comparison here. In that case, a co-inventor disclosed the substance of the invention to a colleague, and thereafter the colleague wrote the software implementing the invention based on the co-inventor's enabling disclosure. On appeal, the Federal Circuit found that this internal enabling disclosure to a co-worker satisfied the second *Pfaff* prong. *Id.* at 1313.

---

[23] *See Weatherchem Corp. v. J.L. Clark, Inc.*, 163 F.3d 1326, 1333 (Fed. Cir. 1998) ("It is immaterial that the record shows no delivery . . . until after the critical date.").

[24] *See Atlanta Attachment Co. v. Leggett & Platt, Inc.*, 516 F.3d 1361, 1367 (Fed. Cir. 2008) ("Consistent with the rule that later refinements do not preclude reduction to practice, it is improper to conclude that an invention is not reduced to practice merely because further testing is being conducted."); *Auction Mgmt. Solutions, Inc. v. Manheim Auctions, Inc.*, 2009 WL 801800, at *3 (N.D. Ga. Mar. 24, 2009) (rejecting argument that subsequent changes to draft computer source code precluded application of on-sale bar).

-26-

Similarly, in this case it is clear that in July or August 1994, Montulli disclosed the specifics of the cookies invention—namely, "the idea of having a Web server request with [sic] a browser keep a cookie for returning back to the Web server later," Defs.' Ex. 21, at 59—to John Giannandrea. Defs.' Opp'n Ex. 16, at 173. Giannandrea, a Netscape principal serving as the Web browser division's chief technology officer, "had more years of experience as a software engineer than [Montulli]," and thus was a person "skilled in the art" for purposes of the *Robotic* test. Defs.' Ex. 21, at 16-17, 61. Notably, Montulli's description of the invention corresponds to the four steps claimed in '670 patent claim 1, particularly the third and fourth steps of receiving and storing a state object. Montulli's recollection is corroborated by Giannandrea's signed declaration submitted to the U.S. PTO, in which Giannandrea states: "In one of a series of design meetings held during July-August, 1994, the inventor, Montulli, disclosed the invention of the [cookies technology]." Defs.' Ex. 23 ¶¶ 2-3, at 59. According to Giannandrea, these meetings involved Montulli and Giannandrea reviewing and drawing on a whiteboard the "Web cookies" design and the "software architecture"—that is, the computer source code—to be used in implementing the cookies invention. *See* Defs.' Ex. 21, at 58-63 (recounting role in reviewing Montulli's design). Following these meetings and the refinement of the cookies design and software architecture, Montulli began writing the actual cookies computer code, which he then entered into the Netscape source repository in draft form for the first time on October 3 or 4, 1994. *See id.* As in *Robotic*, it is clear from the summary judgment record that Montulli wrote the software code implementing the cookies invention only after disclosing the initial design and subsequent refinements, including the form of the source code, to Giannandrea prior to the critical date, and that Giannandrea, a person with more years of programming experience than

-27-

Montulli, would have been able to write the cookies source code based on Montulli's enabling disclosure. *See Robotic Vision Sys.*, 249 F.3d at 1311-12. Thus, these undisputed facts clearly and convincingly show that the invention was "ready for patenting" under the *Robotic* interpretation of the second *Pfaff* prong.

### 4. Conclusion

These undisputed record facts clearly and convincingly show that Netscape offered—and indeed sold—the method of transferring and storing state information set forth in claim 1 of the '670 patent to MCI before October 6, 1994, the critical date, with the understanding that it would be implemented in marketplaceMCI. Moreover, clear and convincing evidence demonstrates that each limitation found in claim 1 of the '670 patent was anticipated by the product sold to MCI. By contrast, the current record does not allow a determination that claims 2-10 and 14-26 were anticipated by the MCI sale or were rendered obvious by MCI and Netscape's shared understanding on August 10, 1994 that MCI required client storage of state information. Finally, it is clear from the undisputed facts that Montulli disclosed the cookies design and software architecture to Giannandrea in a series of design review meetings in August and September 1994, and that Montulli thereafter began reducing the conceived invention to computer source code, which existed in draft form on October 3 or 4, 1994. Accordingly, because both *Pfaff* prongs are met as to claim 1 such that a trier of fact would have "an abiding conviction that the truth of [defendants'] factual contentions are highly probable," defendants are entitled to summary judgment as to claim 1's invalidity under the § 102(b) on-sale bar. *Pfizer, Inc.*, 480 F.3d at 1360 n.5 (citations and quotation marks omitted). Yet, with respect to claims 2-10 and 14-26, the current record does not warrant summary judgment for either party on the ground of the on-sale

-28-

bar because the parties dispute whether the limitations found in these patent claims were anticipated or rendered obvious in August and September 1994. Thus, it remains to litigate at trial defendants' § 102(b) on-sale bar defense with respect to claims 2-10 and 14-26.

## B. Public Use

Plaintiff moves for summary judgment as to the issue of public use under § 102(b). That statutory provision states that a person is not entitled to a patent where "the invention was . . . in public use . . . in this country, more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b). To establish public use under § 102(b), an alleged infringer must show that the purported use was (i) accessible to the public, or (ii) was commercially exploited prior to the date of the patent application. *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 424 F.3d 1374, 1380 (Fed. Cir. 2005). A patented invention is considered to be "in public use if it is shown to or used by an individual other than the inventor under no limitation, restriction, or obligation of confidentiality." *Petrolite Corp. v. Baker Hughes Inc.*, 96 F.3d 1423, 1425 (Fed. Cir. 1996) (citing *In re Smith*, 714 F.2d 1127, 1134 (Fed. Cir. 1983)). Importantly, public use must be proved by clear and convincing evidence. *See Am. Seating Co. v. USSC Group, Inc.*, 514 F.3d 1262, 1267 (Fed. Cir. 2008). In this case, defendants argue that Netscape sent early versions of software containing the cookies technology to Silicon Graphics, International ("SGI"), MCI, the San Jose Mercury News, and Digital Equipment Corporation ("DEC") in September 1994, and displayed the technology at the September 1994 Interopt trade show. These assertions of public use under § 102(b) plainly fail because they are not supported by record evidence.

To begin with, the current record contains no evidence that a test release was actually sent

-29-

to the San Jose Mercury News or DEC. Defendants merely cite a San Jose Mercury News press release announcing a partnership between Netscape and San Jose Mercury News, Defs.' Ex. 17—which is inadmissible hearsay and may not be considered on summary judgment—and an email from Andreessen thanking Netscape programmer Jamie Zawinski for "putting up with . . . the pending DEC pre-alpha," Defs.' Opp'n Ex. 17, neither of which indicate actual transfer of the patented technology. Furthermore, the record evidence does not indicate whether the "alpha" or "beta" versions of plaintiff's Web browser sent to these companies were cookies-functional. Thus, there is no evidence that the invention was shown to, or actually used by, a Netscape customer prior to the critical date.[25] *See Petrolite Corp.*, 96 F.3d at 1423 (citation omitted); 2-6 Chisum on Patents § 6.02[5] (noting the Federal Circuit requires actual use). Finally, as to the Interop trade show, defendants' evidence—an August 3, 1994 email from Tom Paquin of Netscape evaluating whether a public demonstration of "X mozilla" was technologically feasible—does not establish that the Interop demonstration actually occurred. *See* Defs.' Opp'n Ex. 18; *see also Beachcombers, Int'l, Inc. v. Wildewood Creative Prods., Inc.*, 31 F.3d 1154, 1159-60 (Fed. Cir. 1994) (discussing adequacy of evidence in case of private party demonstration). Accordingly, because no triable issue of fact exists as to whether the patented cookies technology was sent to Netscape customers prior to the critical date, and there is not sufficient evidence for a trier of fact to conclude by clear and convincing evidence that the

---

[25] Indeed, there is no evidence to suggest that SGI, San Jose Mercury News, or DEC were aware of, or interested in, the patented cookies technology. As Andreessen testified, the cookies functionality was a product of MCI's specific request, and was simply integrated into plaintiff's generally-marketed Web browser product. *See* Defs.' Opp'n Ex. 15, at 139-40. Defendants cite no facts indicating that SGI, the San Jose Mercury News, or DEC required client storage of state information, as MCI explicitly did.

patented invention was sent to a Netscape customer prior to the critical date, plaintiff is entitled to summary judgment as to the § 102(b) public use defense.

## C. Inventorship

Plaintiff moves for summary judgment on defendants' inventorship defense under § 102(f), which prohibits a person from obtaining a patent if "he did not himself invent the subject matter sough to be patented." 35 U.S.C. § 102(f). In this case, defendants contend that the '670 patent is invalid because Montulli, the sole named inventor, did not name Dr. Cerf, Dr. Klensin, or Giannandrea as co-inventors, all of whom, defendants claim, made significant contributions to the cookies invention. Importantly, defendants bear the burden of proving misjoinder or nonjoinder of inventors by clear and convincing evidence. *Acromed Corp. v. Sofamor Danek Group, Inc.*, 253 F.3d 1371, 1379 (Fed. Cir. 2001).

It is well-established that a person must make a significant contribution to the invention in order to be named a joint inventor. *See Pannu v. Iolab Corp.*, 155 F.3d 1355, 1351 (Fed. Cir. 1998). Moreover, it is also well-established that "[o]ne who merely suggests an idea of a result to be accomplished, rather than means of accomplishing it, is not a joint inventor." *Natron Corp. v. Schukra U.S.A., Inc.*, 558 F.3d 1352, 1359 (Fed. Cir. 2009) (citing *Garrett Corp. v. United States*, 422 F.2d 874, 881 (Ct. Cl. 1970)). In *Natron*, the Federal Circuit rejected an argument of nonjoinder because the alleged co-inventor had done little more than pose a result to the named inventor, essentially leaving the named inventor to figure out how to accomplish the result.

These principles, applied to the undisputed record facts, compel the conclusion that defendants cannot establish clearly and convincingly that Dr. Klensin, Dr. Cerf, or Giannandrea should have been named co-inventors. Dr. Klensin and Dr. Cerf, both MCI executives who

-31-

attended the August 10, 1994 meeting, contributed to the claimed invention, if at all, only by providing plaintiff with the end-goal of client storage of state information. *See Ethicon, Inc. v. U.S. Surgical Corp.*, 937 F. Supp. 1015, 1035 (D. Conn. 1996) ("An entrepreneur's request to another to create a product that will fulfill a certain function is not conception—even if the entrepreneur supplies continuous input on the acceptability of offered products."). Indeed, weighing against a finding of co-inventorship is Dr. Cerf's testimony that he and Dr. Klensin merely suggested a means of accomplishing the goal without specifying how to reach that goal. *See* Defs.' Ex. 5, at 78 ("Neither John [Klensin] nor I had any particular need to define exactly how [client-side storage] was implemented."); *see also Natron*, 558 F.3d at 1359.

Nor is Giannandrea's testimony clear and convincing evidence that he contributed significantly to the cookies invention. Although it is undisputed that Giannandrea met with Montulli to review the cookies technology design in the summer of 1994, Giannandrea clearly states (i) that Montulli brought to the meeting the idea of having the Web server request that the browser store the cookie in order to be returned later, (ii) that Montulli sought only Giannandrea's verification of the design, (iii) that Montulli was the only person to implement the design by writing the source code, and (iv) that the extent of his, Giannandrea's, "collaboration" was limited to "making [the invention] more general purpose, and just validating the design." *See* Defs.' Ex. 21, at 58-66. When measured against the "dimension of the full invention," Giannandrea's unspecified and vague contributions do not transform him into a co-inventor. *See Pannu*, 155 F.3d at 1351. Even accepting, as defendants argue, that Giannandrea's suggestions ultimately appear in the '670 patent, defendants' argument nonetheless fails as "a person does not qualify as an inventor simply because his contributions to an invention appear in the claims of

-32-

the patent." *See Levin v. Septodont, Inc.*, 34 Fed. App'x 65, 72-73 (4th Cir. 2001).

Accordingly, because there are no triable issues of fact as to Dr. Cerf's, Dr. Klensin's, and Giannandrea's contributions to the cookies invention, and the current record evidence would not permit a trier of fact to conclude by clear and convincing evidence that these alleged co-inventors made significant contributions to the cookies invention such that they should have been named co-inventors, plaintiff is entitled to summary judgment with respect to inventorship.[26]

## D. Indefiniteness of Claims 9, 10, and 14

Defendants contend that they are entitled to summary judgment invalidating claims 9, 10, and 14 because these claims are fatally indefinite under 35 U.S.C. § 112. Specifically, § 112 states that the patent document must "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112. Where the patent claims meet this standard, people reasonably skilled in the art are able to discern the bounds of the claimed invention. *See IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1383-84 (Fed. Cir. 2005). Importantly, whether a patent claim reasonably apprises one skilled in the art of the invention's scope is a question of law. *See Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1376 (Fed. Cir. 2001). Moreover, because issued patents are presumed valid, a court may only find claim indefiniteness "if the claim is insolubly ambiguous, and no narrowing construction can properly be adopted." *Honeywell Int'l, Inc. v. Int'l Trade Comm'n*, 341 F.3d 1332, 1338-39 (Fed. Cir. 2003) (citation

---

[26] It is worth noting that Dr. Cerf's, Dr. Klensin's, and Giannandrea's opinions that they did not contribute significantly to the cookies invention and disclaiming inventorship are not dispositive. *See Regents of Univ. of N.M. v. Knight*, 321 F.3d 1111, 1121-22 (Fed. Cir. 2003) (finding that appellants were inventors despite their disclaiming inventorship).

and quotation marks omitted).

In this case, both plaintiff and defendants cite the Federal Circuit's decision in *IPXL Holdings* to support their arguments. There, the Federal Circuit held that a patent claim containing both "the system of claim 2 and a method for using that system" was indefinite because one reasonably skilled in the art would not know whether infringement occurred upon creation or use of the system. *See* 430 F.3d at 1384.[27] Here, claims 9, 10, and 14 do not run afoul of the *IPXL Holdings* indefiniteness rule because these patent claims do not require a user to execute the claimed method; rather, the claimed computer systems are simply described as *capable* of performing the method, not as actually performing the method.[28] Thus, one skilled in the art would have adequate notice that the '670 patent is infringed only when an apparatus capable of performing the described functions is made, not when the apparatus executes the claimed method.[29] Accordingly, defendants' motion for summary judgment on their § 112

---

[27] The patent claim at in issue in *IPXL Holdings* reads, in full:

The system of claim 2 [including an input means] wherein the predicted transaction information comprises both a transaction type and transaction parameters associated with that transaction type, *and the user uses the input means* to either change the predicted transaction information or accept the displayed transaction type and transaction parameters.

*IPXL Holdings*, 430 F.3d at 1384 (emphasis in original).

[28] *See Microprocessor Enhancement Corp. v. Tex. Instruments Inc.*, 520 F.3d 1367, 1375 (Fed. Cir. 2008) ("Claim 7 . . . is clearly limited to a pipelined processor possessing the recited structure and *capable* of performing the recited functions, and is thus not indefinite under *IPXL Holdings*." (emphasis in original)); *Datamize, LLC v. Plumtree Software, Inc.*, 2007 WL 5720627, at *11 (N.D. Cal. Aug. 7, 2007) (rejecting fatal indefiniteness argument where claim involved a "computer program storage medium" used to execute a specifically defined process).

[29] In arguing for indefiniteness, defendants cite the conclusion of plaintiff's expert that claims 9, 10, and 14 are apparatus claims, but are directly infringed only when a person executes

indefiniteness defense must be denied. And because whether patent claims are fatally indefinite is a legal, not factual, question based solely on the language of the contested patent claims, this issue may not be further litigated at trial.

## IV.

In addition to their invalidity arguments, the parties filed cross-motions for summary judgment on defendants' equitable defenses.

*A. Waiver*

The parties argue that they are entitled to summary judgment as to plaintiff's alleged waiver of its right to enforce the '670 patent. Specifically, defendants argue (i) that plaintiff participated in the Internet Engineering Task Force ("IETF"), a standards-setting organization ("SSO"), (ii) that plaintiff had a duty to disclose its ownership of the '670 patent to the IETF, and (iii) that plaintiff's failure to do so constituted a waiver of its right to enforce the '670 patent.

Under the Federal Circuit's decision in *Qualcomm Inc. v. Broadcom Corp.*, 548 F.3d 1004, 1011-12 (Fed. Cir. 2008), patent enforcement is precluded where an SSO member is subject to a disclosure duty and breaches that disclosure duty. The question whether a disclosure duty exists is legal in nature, but importantly is based on factual underpinnings, such as the scope of the SSO's disclosure provisions and the manner of their implementation. *See id.* at 212. Thus, on the one hand, if the undisputed record facts show that plaintiff participated in the IETF

the method set forth in claim 1. Yet, this expert's opinion is not dispositive and does not necessarily indicate what one skilled in the art would understand. *See Flour City Architectural Metals v. Alpana Aluminum Prods., Inc.*, 454 F.2d 98, 107-08 (7th Cir. 1972) ("We do not measure the knowledge of any particular person, or any particular expert who might testify in the case, but, rather . . . the knowledge of a hypothetical person skilled in the art, who has thought about the subject matter of the patented invention in the light of that art.").

and the IETF disclosure policy required plaintiff to disclose the '670 patent, then defendants are entitled to summary judgment on this issue. But if, on the other hand, plaintiff was not an IETF member or the IETF disclosure obligation did not reach the '670 patent, then plaintiff is entitled to summary judgment on this issue.

In this case, the parties dispute numerous material facts and hence summary judgment can be granted neither to Netscape nor to defendants. To begin with, plaintiff claims that only individuals can be IETF members and that Montulli acted individually as an IETF member, while defendants claim that Netscape presented itself as an IETF member and had over fifty employees participating in IETF. *See, e.g.,* Pl.'s Ex. 13; Defs.' Ex. 58, at 13-22. In addition, the parties dispute the IETF disclosure policy's scope and manner of its implementation. *See, e.g.,* Pl.'s Exs. 22-26; Defs.' Exs. 59, 60, 76, 78. In response, plaintiff contends that it is entitled to summary judgment as a matter of law as to waiver notwithstanding these disputed facts because Netscape's undisputed non-disclosure of the '670 patent to the IETF precludes a finding of waiver. Yet, this argument was rejected in *Qualcomm*, which held that a patentee may impliedly waive its right to enforce a patent by remaining silent in the face of its SSO disclosure duty. *See id.* at 1019-21 (rejecting defense of "true waiver" but finding that "it would be improper to allow Qualcomm to rely on the effect of its misconduct to shield it from the application of the equitable defense of implied waiver"). Thus, while plaintiff did not expressly waive its right to enforce the '670 patent—as the parties do not dispute that plaintiff failed to disclose the existence of the '670 patent to the IETF—defendants may yet prevail on their implied waiver defense at trial. Accordingly, because there are disputed issues of fact to be litigated at trial with respect to defendants' implied waiver defense, the parties' cross-motions for summary judgment on this

issue must be denied.

## B. Laches

Defendants move for summary judgment on their laches defense. Laches is an equitable defense, cognizable under 35 U.S.C. § 282, that prevents a patentee who unreasonably sleeps on his rights from later seeking relief for infringement. *See Stone v. Williams*, 873 F.2d 620, 623 (2d Cir. 1989) (quoting Latin maxim *vigilantibus non dormientibus aequitas subvenit*, meaning "equity aids the vigilant, not those who sleep on their rights"). Application of this defense requires proof of two elements: (i) that the patentee's delay in enforcing the patent was unreasonable and inexcusable; and (ii) that the alleged infringer was materially prejudiced—either in an economic or evidentiary manner—by the patentee's delayed enforcement. *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1028 (Fed. Cir. 1992) (en banc). Where the patentee's delay is greater than six years, a presumption of unreasonableness applies and shifts the burden of production to the patentee to rebut the presumption, although notably the burden of persuasion remains with the alleged infringer. *Id.* at 1034-39. Importantly, "[t]he period of delay begins only when the patentee has actual or constructive knowledge of defendants' potentially infringing activities," *see Wanlass v. Gen. Elec. Co.*, 148 F.3d 1334, 1337 (Fed. Cir. 1998), and cannot begin until the patent has issued, *Aukerman*, 960 F.2d at 1032. Although "[t]he application of the defense of laches is committed to the sound discretion of the district court,"[30] summary judgment is not warranted where, as

---

[30] *Serdarevic v. Advanced Med. Optics, Inc.*, 532 F.3d 1352, 1358 (Fed. Cir. 2008) (quoting *Aukerman*, 960 F.2d at 1032) (quotation marks omitted).

here, there remain genuine issues of material fact.[31]

At the threshold, however, the parties contest whether the issue of laches is moot in this case because plaintiff does not seek past damages for infringement. It is well-settled that where laches applies, a patentee that prevails on infringement is prohibited from recovering past damages. *See Aukerman*, 960 F.2d at 1039-41 ("[W]e will continue to hold, as a matter of policy, that laches bars relief on a patentee's claim only with respect to damages accrued prior to suit."). Concomitantly, a patentee may generally recover post-suit damages and request prospective injunctive relief, as Netscape seeks here. *See id.* (holding that these remedies are barred by the defense of equitable estoppel, but not laches). In *Odetics, Inc. v. Storage Tech. Corp.*, however, the Federal Circuit affirmed a determination that laches barred injunctive relief as to products manufactured or sold during the pre-suit laches period. *See* 185 F.3d 1259, 1272-74 (Fed. Cir. 1999), *aff'g* 14 F. Supp. 2d 785, 789-94 ("We conclude, then, that laches will result in the patentee abrogating his right to exclude any infringing products sold prior to the filing of the complaint."). Accordingly, defendants argue that their laches defense is not moot because, should plaintiff prevail on infringement, any injunctive relief issued must exclude systems built prior to suit.

In response, plaintiff contends that the *Odetics* limitation applies only to *sales* of the patented invention, not manufacture or use, and thus that decision is inapplicable here because defendants never sold their computer systems. In *Odetics*, the alleged infringer, Storage Technology Corp. ("STK") manufactured, sold, and maintained a product that infringed two

---

[31] *See Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1349 (Fed. Cir. 2009) (reversing grant of summary judgment on laches in favor of alleged infringer because dispute of material fact existed with respect to patentee's knowledge of alleged infringement).

system claims found in Odetics's patent. No method claims were implicated in the suit, and Odetics was denied an injunction precluding STK's customers, who had purchased the products, from continuing to use the infringing products. By contrast, this case involves two significant elements not present in *Odetics*: (i) that plaintiff's allege infringement of both apparatus and method claims, and (ii) that defendants manufactured their computer systems for the purpose of carrying out the claimed method, not to sell to third parties.

The presence of a method claim in this case is therefore in tension with the *Odetics* reasoning because a method claim is infringed each time the method is performed. *See BMC Res., Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1378-79 (Fed. Cir. 2007). *Odetics* permitted STK's customers to continue using their machines even though the manufacture and sale of these machines was found to infringe Odetics's patent because the *sale* of the infringing product during the laches period abrogated the patentee's interest as to the machine itself, not the *use* of the product. *See* 185 F.3d at 1273. Yet, this principle, applied here, would essentially permit defendants to continue infringing the claimed method anew as long as they continued to use their existing computer systems. Arguably, this would have the practical effect of transforming the laches defense into one of equitable estoppel, despite the settled understanding that the requirements, justifications, and remedies for these doctrines are distinct.[32] In the circumstances,

_____

[32] *See Aukerman*, 960 F.2d at 1034 ("[L]aches focuses on the reasonableness of the plaintiff's delay in suit. . . . [E]quitable estoppel focuses on what the defendant has been led to reasonably believe from the plaintiff's conduct."); *id.* at 1040 ("[L]aches bars damages for a patent defendant's pre-filing infringement but not for post-filing damages or injunctive relief *unless elements of estoppel are established.*" (emphasis added)); *Odetics*, 14 F. Supp. 2d at 790 ("Odetics cannot be denied an injunction against STK for future manufacture and sale of infringing systems simply because Odetics has lost something in the past; *only equitable estoppel would lead to that result.*" (emphasis added)).

this issue—which has not yet been squarely addressed by the Federal Circuit and merits close scrutiny—is more appropriately resolved following resolution of the predicate infringement issue.

At this point in the litigation, it is appropriate simply to recognize that genuine issues of material fact exist as to the extent of plaintiff's knowledge of defendants' alleged infringing activities and hence preclude an award of summary judgment. Although plaintiff maintains that it gained actual knowledge of defendants' infringement only in the summer and fall of 2008 and promptly brought suit thereafter in February 2009, the parties sharply contest whether and when constructive knowledge of defendants' alleged infringement can be imputed to plaintiff. In the absence of undisputed facts relating to plaintiff's knowledge of defendants' infringing activities, the presumption of laches cannot be applied or analyzed on summary judgment, and thus the issue of material prejudice to defendants need not be reached. Here, an examination of the record evidence—consisting mainly of defendants' U.S. Securities and Exchange Commission Form 10-Ks, agreements between plaintiff's parent company and defendants, and press releases by AOL and Commission Junction announcing Netscape and Commission Junction's 2004 joint marketing effort, *see* Defs.' Exs. 35-43—reveals that a trier of fact could reasonably conclude that plaintiff "did not know, or should not have known, of each infringer's activities." *Hall v. Aqua Queen Mfg., Inc.*, 93 F.3d 1548, 1553 (Fed. Cir. 1996). Accordingly, the laches issue cannot be resolved on summary judgment because a trier of fact must determine at trial when plaintiff gained knowledge of defendants' infringing activities and, if so, whether plaintiff's delay in enforcing the '670 patent caused defendants to sufffer economic or evidentiary prejudice, and hence defendants' motion for summary judgment as to laches must be denied.

## C. Equitable Estoppel

Plaintiff moves for summary judgment on the issue of equitable estoppel. In *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1028 (Fed. Cir. 1992) (en banc), the Federal Circuit had occasion to clarify that an alleged infringer must establish three elements of an equitable estoppel defense in patent infringement cases: (i) that the patentee, through misleading conduct, represented that enforcement of the patent was not intended; (ii) that the alleged infringer relied on that conduct; and (iii) that the patentee's enforcement would materially prejudice the alleged infringer.

As part of the first element that the patentee mislead the alleged infringer as to the patentee's intention to enforce the patent, "[i]t is clear . . . that for equitable estoppel the alleged infringer cannot be unaware . . . of the patentee and/or its patent." *Id.* at 1042. This principle proves dispositive here, as it is undisputed that defendants had no knowledge of the '670 patent prior to the initiation of the instant suit, and hence under *Aukerman* defendants cannot meet their burden of establishing the first element of the equitable estoppel test. *See* Pl.'s Statement of Facts ¶ 8.[33] In response, defendants argue that certain district courts have found an alleged infringer's lack of knowledge not to be dispositive where the patentee neglects to disclose the existence of its patent in the face of an obligation to speak.[34] Yet, these district court decisions

---

[33] This paragraph of plaintiff's statement of facts is not disputed in defendants' opposition brief, and defendants' responses to certain interrogatories make clear that defendants had no knowledge of the '670 patent prior to plaintiff's filing this patent infringement suit.

[34] *See, e.g., Hynix Semiconductor, Inc. v. Rambus, Inc.*, 2006 U.S. Dist. LEXIS 48028, at *13-*19 (N.D. Cal. July 6, 2006); *Stmicroelectronics, Inc. v. Sandisk Corp.*, 2006 U.S. Dist. LEXIS 38541, at *10-11* (E.D. Tex. June 12, 2006) ; *Electromotive Div. of GMC v. Transp. Sys. Div. of GE*, 275 F. Supp. 2d 850, 858-89 (E.D. Mich. 2003).

are neither controlling in this case nor persuasive given (i) that the Federal Circuit's controlling decision in *Aukerman* clearly states, "the alleged infringer *cannot be* unaware" of the allegedly infringed patent,[35] and (ii) that these district court decisions are factually distinguishable. Specifically, in *Electromotive Division*, the patentee affirmatively misrepresented that it did not possess a patent for a particular invention even though the alleged infringer posed this precise question to the patentee; in *Hynix* and *Stmicroelectronics*, the patentees did not disclose ownership of their patents despite entering into agreements with the alleged infringers for mutual licensing of related patents. By contrast, although defendants here allege that Netscape's parent company, AOL, had business dealings with certain defendants and that AOL failed to disclose the existence of the '670 patent in the course of those dealings,[36] no record evidence shows that *plaintiff* failed to disclose ownership of the '670 patent when directly asked by defendants or when negotiating patent licenses with defendants. Accordingly, because it is undisputed that defendants had no knowledge of the '670 patent prior to plaintiff's filing this patent infringement suit, and because no record evidence would permit a trier of fact to conclude that business relationships between AOL and defendants specifically imposed on *plaintiff* an affirmative duty to disclose the '670 patent's existence, plaintiff is entitled to summary judgment as a matter of law on this issue.

## V.

Defendants move for summary judgment on the issue of infringement. Specifically,

---

[35] *Aukerman*, 960 F.2d at 1042 (emphasis added); *see also Windbond Elecs. Corp. v. Int'l Trade Comm'n*, 262 F.3d 1363, 1374 (Fed. Cir. 2001) ("[T]he alleged infringer *must* have knowledge of the patentee and its patent." (emphasis added)).

[36] *See* Defs.' Opp'n Exs. 35-43.

defendants claim (i) that they do not, as a matter of law, infringe claims 1-8 under any construction of the '670 patent's claim terms because they do not perform all the steps of claim 1's method; (ii) that they do not infringe any of the asserted claims if their proposed *Markman* claim constructions are adopted; and (iii) that plaintiff cannot maintain its claim for willful infringement as a matter of law. These arguments are addressed in turn.

## A. Non-Infringement of Claims 1-8

Defendants contend that they do not infringe '670 patent claims 1-8 because (i) they do not perform all the steps of independent claim 1, *see BMC Resources, Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1378-79 (Fed. Cir. 2007); and (ii) that defendants are not joint infringers because defendants lack the requisite control over end-computer users, *see MiniAuction, Inc. v. Thompson Corp.*, 532 F.3d 1318, 1329-30 (Fed. Cir. 2008). Yet, a thorough examination of record evidence plainly reveals disputes of material facts, generally in the form of competing expert testimony, relating to whether defendants directly control or cause end-users' Web browsers to perform the claimed method. *See, e.g.*, Defs.' Attach. 4 ¶¶ 72-171 (summarizing experts' opinions). These material disputes of facts preclude an award of summary judgment because these factual disputes must be resolved by a trier of fact at trial, and hence defendants' motion must be denied as to non-infringement of claims 1-8.

## B. Non-Infringement of Contested Claims Under Defendants' Markman *Claim Constructions*

Defendants argue that they are entitled to summary judgment as a matter of law if their proposed claim constructions are adopted. Although defendants' brief does not specify which constructions in particular prove dispositive, defendants' argument appears to rely on their proposed constructions of the claim terms "file," "state information," and whether the state

object and requested file must be transmitted simultaneously. Defendants' proposed claim constructions were not adopted as to these terms. *See Netscape I*, --- F. Supp. 2d ----, 1:09cv225, at 19-21 (state object and state information); *id.* at 21-24 (file); *id.* at 31-32 (order of claim 1 steps). Accordingly, defendants' argument fails because it is premised on certain rejected claim constructions, and hence this theory of non-infringement may not be re-asserted at trial and defendants' motion for summary judgment must be denied.

## C. *Willful Infringement*

Defendants move for summary judgment with respect to plaintiff's claim of willful infringement. In *In re Seagate Tech., LLC*, 497 F.3d 1360 (Fed. Cir. 2007) (en banc), the Federal Circuit, sitting en banc, set forth the governing standard for claims of willful infringement. More precisely, the Federal Circuit held that "to establish willful infringement, a patentee must show by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent." *Id.* at 1371. If this objective test is met, the claimant must further establish that the objective risk was known, or should have been apparent, to the accused infringer. *See id.*

Although *Seagate* substantially altered the legal test for willful infringement in overruling the negligence standard set forth in *Underwater Devices v. Morrison-Knudsen Co.*, 717 F.2d 1380 (Fed. Cir. 1983), certain factors that pre-date *Seagate* continue to guide the willful infringement analysis. *See Eastman Kodak Co. v. Agfa-Gevaert N.V.*, 560 F. Supp. 2d 227, 302 (W.D.N.Y. 2007) ("While the Federal Circuit in *Seagate Technology, LLC*, le[ft] it to future cases to further develop the application of the standard, it did not reject using factors under the totality of the circumstances." (alteration in original; internal citation and quotation marks

omitted)). In particular, "both legitimate defenses to infringement claims and credible invalidity arguments demonstrate the lack of an objectively high likelihood that a party took actions constituting infringement of a valid patent." *Black & Decker, Inc. v. Robert Bosch Tool Corp.*, 260 Fed. App'x 284, 291 (Fed. Cir. 2008). In addition, when a plaintiff bases its claim of willful infringement on conduct occurring after the lawsuit's initiation, ordinarily it must file a preliminary injunction in order to receive enhanced damages for willful infringement, although the absence of a request for injunctive relief is not dispositive. *See In re Seagate*, 497 F.3d at 1374 ("A patentee who does not attempt to stop an accused infringer's activities [by seeking a preliminary injunction] should not be allowed to accrue enhanced damages based solely on the infringer's post-filing conduct.").

These principles, applied to the undisputed material record facts, compel the conclusion that defendants did not willfully infringe the '670 patent. Here, plaintiff's claim is based on defendants' use of the cookies technology following the initiation of the instant suit, as defendants had no pre-litigation knowledge of the '670 patent. *See* Defs.' Ex. 80, at 5. While not dispositive, plaintiff's decision not to seek a preliminary injunction has been deemed relevant. *See In re Seagate*, 497 F.3d at 1374; *see also Ball Aerosol & Specialty Container, Inc. v. Ltd. Brands, Inc.*, 553 F. Supp. 2d 939, 953 (N.D. Ill. 2008). Moreover, while not all of defendants' arguments are meritorious, defendants do present legitimate defenses and credible invalidity arguments. Indeed, as discussed *supra*, defendants' contention that claim 1 of the '670 patent is invalid under the § 102(b) on-sale bar prevails. More fundamentally, plaintiff points to no record evidence, aside from its own conclusory assertions, that defendants "acted despite an objectively high likelihood that [their] actions constituted infringement of a valid patent." *In re*

*Seagate*, 497 F.3d at 1371.

Accordingly, because there are no material disputes of fact to be resolved by a trier of fact at trial as to this issue, and because plaintiff has not presented evidence that would allow a trier of fact to conclude by clear and convincing evidence that defendants willfully infringed the '670 patent, defendants are entitled to summary judgment on this issue and plaintiff's willful infringement claim must be dismissed.

## VI.

Plaintiff argues that it is entitled to summary judgment on defendants' state law counterclaims of (i) intentional misrepresentation or fraud, (ii) negligent misrepresentation or constructive fraud, and (iii) unfair competition. Specifically, plaintiff cites the well-established principle that state law claims by an alleged infringer based on a patentee's enforcing its patent are preempted by federal patent laws unless the alleged infringer can show, by clear and convincing evidence, that enforcement was undertaken in bad faith. *See Hunter Douglas, Inc. v. Harmonic Design, Inc.*, 153 F.3d 1318, 1336-37 (Fed. Cir. 1998). Importantly, a claimant must show first that the allegations of infringement were "objectively baseless" such that "no reasonable litigant could realistically expect success on the merits." *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49 (1993). Once objective baselessness is established, the claimant must then show that enforcement was subjectively pursued in bad faith. Given the presumption of good faith, a claimant carries a "heavy burden" and, to survive summary judgment, "must present affirmative evidence sufficient for a reasonable jury to conclude that the patentee acted in bad faith, in light of the burden of clear and convincing evidence that will adhere at trial." *Golan v. Pingel Enter., Inc.*, 310 F.3d 1360, 1371 (Fed. Cir.

2002).

Here, defendants cite as evidence of bad faith (i) that plaintiff knew that the '670 patent was invalid under the § 102(b) on-sale bar, (ii) that plaintiff did not inform the U.S. PTO of the offer to sell technology to MCI in its '670 patent application;[37] and (iii) that Montulli informed plaintiff of his belief that the patented cookies technology should be placed in the public domain. None of these contentions has merit.

First, although clear and convincing evidence establishes that the § 102(b) on-sale bar invalidates claim 1 of the '670 patent, this conclusion does not necessarily demonstrate objective baselessness, as questions of infringement and invalidity remain as to claims 2-10 and 14-26. In addition, it is well-settled that "a patentee . . . is fully permitted to press [his] rights [as patentee] even though he may misconceive what those rights are." *Mikohn Gaming Corp. v. Acres Gaming, Inc.*, 165 F.3d 891, 897 (Fed. Cir. 1998). Nor does such a finding of invalidity as to claim 1 necessarily indicate that a patentee subjectively acted in bad faith. Indeed, defendants present no evidence that plaintiff knew that the '670 patent was invalid under § 102(b) and nonetheless enforced the patent despite that knowledge. Furthermore, defendants' remaining contentions—that plaintiff allegedly chose not to inform the U.S. PTO of the MCI offer, and that Montulli allegedly believed that the patented technology should remain in the public domain—are immaterial because neither fact affirmatively demonstrates that the instant suit was objectively baseless or was subjectively filed in bad faith. Accordingly, because defendants

---

[37] Defendants also argue that the patent examiner rejected certain applications related to the '670 patent after independently discovering that the claims in those patents were virtually identical to certain '670 patent claims. Yet, this evidence, even if assumed to be true, relates only to *related* applications and does not show whether plaintiff objectively or subjectively enforced the *'670 patent* in bad faith.

present no evidence that would allow a trier of fact to conclude by clear and convincing evidence that plaintiff filed the instant suit in bad faith, defendants' state law counterclaims must be preempted and dismissed, and plaintiff's request for summary judgment as to these counterclaims must be granted.

## VII.

In sum, defendants have established by clear and convincing evidence that the § 102(b) statutory on-sale bar invalidates claim 1 because the cookies invention was sold to MCI prior to the critical date. Yet, the facts underlying whether the on-sale bar applies to claims 2-10 and 14-26 are disputed. Accordingly, defendants' request for summary judgment as to their § 102(b) on-sale bar invalidity defense is granted in part and denied in part, and plaintiff's request for summary judgment as to this issue is denied in all respects. Thus, it remains to litigate at trial whether the § 102(b) on-sale bar invalidates claims 2-10 and 14-26.

In addition, plaintiff's motion for summary judgment must be granted as to the following issues: (i) equitable estoppel; (ii) public use; (iii) inventorship; and (iv) preemption of defendants' state law counterclaims. Therefore, these invalidity and equitable defenses may not be re-asserted at trial, and defendants' state law counterclaims must be dismissed. Moreover, plaintiff's motion for summary judgment must be denied as to waiver because disputed material facts relating to implied waiver remain to be litigated at trial. Plaintiff's motion with respect to prior art is deferred pending further briefing.

Furthermore, defendants' motion for summary judgment must be granted as to plaintiff's claim of willful infringement, which claim is dismissed from plaintiff's amended complaint. Yet, defendants' motion must be denied as to the following issues: (i) indefiniteness of claims 9,

10, and 14; (ii) waiver; (iii) laches; (iv) non-infringement of '670 patent claims 1-8; and (v) non-infringement of all asserted '670 patent claims under defendants' *Markman* claim constructions. Because there are no triable issues of fact with respect to defendants' indefiniteness invalidity defense and the non-infringement theory based on defendants' rejected *Markman* claim constructions, these issues may not be further litigated at trial. Defendants' waiver and laches equitable defenses, however, remain to be litigated at trial because material disputes of fact must be resolved by a trier of fact.

An appropriate Order will issue.

Alexandria, Virginia
January 29, 2010

/s/

T. S. Ellis, III
United States District Judge